

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

---

## NO. 2-07-256-CR

---

MARSHALL MASHBURN II                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

------------

### FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

Appellant Marshall Mashburn II brings seven points challenging his conviction and life sentence for murder.  We affirm.

### Background[1]

In January 1999, a man doing construction work found a femur and what he described as a long-handled red knife at a site he was clearing in Lewisville,

---

[1]  Because appellant challenges the sufficiency of the evidence upon which he was convicted, a more detailed description of the facts is included later in the opinion.

Texas near Interstate 35 and Highway 407. After he contacted the police about his discovery, Dr. Dana Austin, a forensic anthropologist with the Tarrant County Medical Examiner's Office, and her team searched the area and found more remains. They recovered about a third of a human skeleton; a large piece from the back of the head was intact, but the rest was in pieces. Some of the bones had been broken by the heavy equipment that had pushed them. Dr. Austin determined that the remains were from a white or Hispanic male between the ages of sixteen and twenty-three. Dr. Austin's team also found a Fila athletic shoe, a handle and blade from a machete, a Dallas Cowboys football jersey, the waistband from a pair of what were probably boxer shorts, and the remains of a pair of jeans or shorts.

In January 2006, Lewisville police contacted Dr. Austin to determine if the remains were those of Santino Schraer, who had been missing since 1997. Orthodontic records and DNA testing showed that the remains were Schraer's.

Detective Richard Anders of the Lewisville Police Department was part of the team that found Schraer's remains. He began investigating Schraer's disappearance after receiving a phone call from Schraer's mother in January 2006. After the remains found in 1999 were identified as Schraer's, Detective Anders discovered that Schraer had been a suspect in a 1997 sexual assault of a twelve-year-old girl that had occurred at a motel party in Lewisville. The date

2

of the police report in that case was September 12, 1997, around the time Schraer disappeared. From the report's list of the names of persons at the party, Detective Anders located Randy Horton, who claimed to be present with several persons, including appellant, when Schraer was killed. As a result of Horton's information, the State charged appellant with Schraer's murder by an indictment dated September 21, 2006. Appellant was arrested in Love County, Oklahoma on September 28, 2006.

The indictment alleges that appellant murdered Schraer by intentionally or knowingly causing Schraer's death by striking him with a pipe or with an unknown object. It also alleges that appellant committed the offense of felony murder—by committing an act clearly dangerous to human life by striking Schraer with a pipe or an unknown object, with the intent to cause serious bodily injury. On April 19, 2007, the State filed a motion to amend the indictment, which the trial court granted on May 3, 2007. The trial court ordered that the felony murder counts of the indictment be amended to allege that appellant intended to cause serious bodily injury to Schraer.

After a four-day trial in June 2007, a jury found appellant guilty of murder "as alleged in the indictment," and sentenced him to confinement for life. Appellant timely filed this appeal.

**Points on Appeal**

In his first point, appellant contends that he was denied the right to effective counsel during the thirty-day period after his sentencing for filing a motion for new trial and that this appeal should be abated to allow him time to file an out-of-time motion for new trial. In his second and third points, appellant claims that the evidence is legally and factually insufficient to support his conviction. Appellant's fourth and fifth points challenge the trial court's refusal to submit lesser-included offense instructions on aggravated assault and manslaughter. In his sixth point, appellant contends that the trial court erred by failing to instruct the jury that accomplice testimony must be corroborated and by failing to define an accomplice. Finally, in his seventh point, appellant complains about the trial court's refusal to instruct the jury on sudden passion at punishment.

**Right to Counsel At Critical Stage of Proceeding**

In his first point, appellant claims that he was deprived of his right to counsel during the thirty-day period for filing a motion for new trial.

The trial court sentenced appellant on June 21, 2007. Thereafter, appellant's trial counsel filed a notice of appeal and motion for new trial. Although both are filemarked July 9, 2007, the certificate of service on the notice of appeal states that a copy was mailed to the State on June 25, 2007,

4

and the certificate of presentment states that appellant's trial counsel hand delivered the motion for new trial to the trial court on June 25, 2007.

On July 6, 2007, appellant sent a handwritten letter to the trial court asking for a transcript of the case so that he could proceed with an appeal. Accordingly, on July 9, 2007, the trial court appointed counsel for appeal. The trial court also denied the motion for new trial that same day without holding a hearing. On July 16, 2007, the notice of appointment of appellate counsel was faxed back to the clerk with a note that the appointed counsel was not at the fax number where the clerk had sent the notice. Thereafter, on July 18, 2007, the trial court appointed current appellate counsel.

Appellant claims that he is entitled to an abatement of this case so that he can file another motion for new trial because the record shows that he was without counsel from at least June 21 to July 9. According to appellant, the motion for new trial filed by trial counsel is inadequate because it was not sworn, contains no affidavits, and sets forth only general arguments in support of a new trial, such as that a new trial should be granted in the interest of justice. Thus, appellant contends that the motion presented nothing for review and was filed solely to extend the appellate deadlines.

A defendant is entitled to counsel during the period for filing a motion for new trial. *Cooks v. State*, 240 S.W.3d 906, 911 (Tex. Crim. App. 2007);

5

*Funk v. State*, 188 S.W.3d 229, 231 (Tex. App.—Fort Worth 2006, no pet.). Trial counsel, whether retained or appointed, has the duty to consult with and to advise his client fully concerning the meaning and effect of the trial court's judgment, the right to appeal from that judgment, and the necessity of giving notice of appeal and taking other steps to pursue an appeal, as well as the duty to express his professional judgment as to possible grounds for appeal and their merit, and delineate the advantages and disadvantages of appeal. *Oldham v. State*, 977 S.W.2d 354, 360–61 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 525 U.S. 1181 (1999); *Funk*, 188 S.W.3d at 231. Accordingly, when trial counsel does not withdraw and is not replaced by new counsel after sentencing, a rebuttable presumption exists that trial counsel continued to represent the defendant during the time for filing a motion for new trial. *Smith v. State*, 17 S.W.3d 660, 662 (Tex. Crim. App. 2000); *Oldham*, 977 S.W.2d at 363; *Funk*, 188 S.W.3d at 231–32.

Here, the record shows that trial counsel took steps to preserve appellant's right to appeal by filing a timely notice of appeal and motion for new trial and presenting the motion for new trial to the judge for a ruling. Thus, the record shows that appellant was represented by counsel until at least June 25, 2007. However, the record shows that although appellate counsel was appointed for appellant July 9, 2007, appellant did not receive the benefit of

6

that counsel until the second attorney was appointed on July 18, 2007, three days before the deadline for filing an amended motion for new trial. Additionally, counsel states that he did not receive notice of the appointment until July 19 or 20. Thus, it appears from the record that appellant was not represented by counsel during at least part of the thirty-day period for filing a motion for new trial.

Nevertheless, appellant has failed to show that he was harmed by the gaps in representation. *See Cooks*, 240 S.W.3d at 911–12. Appellant does not say what issues he would have raised on appeal that were not preserved by the motion for new trial filed and presented by trial counsel, nor are any of the issues in his brief barred from consideration by this court for lack of them being properly raised in a motion for new trial. Thus, we conclude and hold that appellant is not entitled to abatement of this case for the purpose of filing an additional motion for new trial. *See id*. at 912. We overrule appellant's first point.

**Legal and Factual Sufficiency of Evidence**

In his second and third points, appellant contends that the evidence is legally and factually insufficient to support his conviction for murder. Specifically, appellant claims that the evidence is insufficient to prove that his actions caused Schraer's death, or that he was a party to the death, and that

7

there is insufficient evidence corroborating the testimony of appellant's accomplices.

**Standards of Review**

**Legal Sufficiency**

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we

8

"determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

The sufficiency of the evidence should be measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Bowden v. State*, 166 S.W.3d 466, 470 (Tex. App.—Fort Worth 2005, pet. ref'd). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Malik,* 953 S.W.2d at 240. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000).

The standard of review is the same for direct and circumstantial evidence cases. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

**Factual Sufficiency**

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

In determining whether the evidence is factually insufficient to support a conviction that is nevertheless supported by legally sufficient evidence, it is not enough that this court "harbor a subjective level of reasonable doubt to overturn [the] conviction." *Id*. We cannot conclude that a conviction is clearly wrong or manifestly unjust simply because we would have decided differently than the jury or because we disagree with the jury's resolution of a conflict in

the evidence. *Id*. We may not simply substitute our judgment for the fact-finder's. *Johnson*, 23 S.W.3d at 12; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

An opinion addressing factual sufficiency must include a discussion of the most important and relevant evidence that supports the appellant's complaint on appeal. *Sims v. State*, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003). Moreover, an opinion reversing and remanding on factual insufficiency grounds must detail all the evidence and clearly state why the finding in question is factually insufficient and under which ground. *Goodman v. State*, 66 S.W.3d 283, 287 (Tex. Crim. App. 2001); *Johnson*, 23 S.W.3d at 7.

**Accomplice Witness Testimony**

Article 38.14 of the code of criminal of procedure provides that

11

> [a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. ANN art. 38.14 (Vernon 2005). In conducting a sufficiency review under the accomplice-witness rule, the reviewing court must eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to ascertain if there is any evidence that tends to connect the accused with the commission of the crime. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997). "Tendency to connect" rather than rational sufficiency is the standard: the corroborating evidence need not be sufficient by itself to establish guilt beyond a reasonable doubt. *Solomon*, 49 S.W.3d at 361; *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *Cathey*, 992 S.W.2d at 462. The accomplice-witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards. *Id.* at 462–63. To satisfy the accomplice-witness rule there simply needs to be other

12

evidence tending to connect the accused to the commission of the offense. *See id.* at 463.

In determining whether a person was an accomplice, courts may look to events before, during, and after commission of the offense, including actions that show an understanding and common design to do a certain act. *See Kunkle v. State*, 771 S.W.2d 435, 439 (Tex. Crim. App. 1986), *cert. denied*, 492 U.S. 925 (1989). To be an accomplice witness, there must be some affirmative act on the witness's part to assist in the commission of the offense. *Kutzner v. State*, 994 S.W.2d 180, 187 (Tex. Crim. App. 1999. In order to be an accomplice as a matter of law, the person must be susceptible to prosecution for the offense with which the accused is charged or a lesser included offense. *See Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000); *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991); *Kunkle*, 771 S.W.2d at 439. A co-indictee for the same offense is an accomplice as a matter of law. *Burns v. State*, 703 S.W.2d 649, 651 (Tex. Crim. App. 1985). However, a witness is not deemed an accomplice if he or she knew of the crime but failed to disclose it or even concealed it. *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998); *Harris v. State*, 738 S.W.2d 207, 215–16 (Tex. Crim. App. 1986), *cert. denied*, 484 U.S. 872 (1987); *Russell v. State*, 598 S.W.2d 238, 249 (Tex.

13

Crim. App.), *cert. denied*, 449 U.S. 1003 (1980).  Likewise, mere presence at a crime scene does not make an individual an accomplice.  *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006), *cert. denied,* 127 S. Ct. 1832 (2007).

**Applicable Facts**

After appellant was indicted and arrested in Oklahoma, Detective Anders and Texas Ranger Tracy Murphree went to Oklahoma to interview him.  After advising appellant of his *Miranda* rights, which he waived, the officers questioned him about the night Schraer was killed.  Appellant first gave the officers an oral statement in which he denied being in Texas at the time of Schraer's death.  However, over the course of about two hours of questioning, he later gave them a second oral statement, which he then reduced to writing, as follows:

> While at a party at a hotel, it was brought to my attention by Randall Horton, a couple of days after, that [Schraer] had raped his girlfriend's little sister.  He told me that he and Jeff [Stealey] and Casey [Nelson] were going to confront him on it.

> A few minutes later, [Schraer] came outside, and we all confronted him on it.  When he lied to us, we told him we'd kick his ass.  Then he made a comment about her, something along the line of her asking for it.  So I hit him.  Then we said we were going to take him and get him away from here after we [whooped] his ass and that he could never return to [this] house again or we'd kick his ass again.

14

At that point, we took him to the truck and drove off.  While going down the road, Randall and Jeff were having more and more fun with it — beating him.  At that point, I got scared.  This was going too far, and that's not what I wanted to be a part of.

They got to this area of weeds off a highway and drug him out.  At that point, I was so scared I was trying everything to not pay attention to them.   But I could hear them laughing as I walked around.  All I kept saying was, I want to go home.  Then Randall grabbed my arm and said, let's go.  They [stopped] somewhere, I guess to wash the truck, and I started to walk off.  Randall called me back over, and we left again.

The only thing I remember is Randall screaming in my ear, Just shut up, don't say anything about this.  When we got back to the house that night I packed my [clothes], I had there, and left. The only time I saw any of them again was two or three months ago I saw Casey and someone else I did not recognize.  Casey said someone was looking for me about [Schraer], and I said, I don't remember much, and last I heard [Schraer] was gone, packed up, and left.  At that point I walked away because I didn't want to go back through that night again.

According to Detective Anders, this confession was similar to the first story appellant had told him, but not the same.

Detective Anders testified that these events took place at Danny Smith's house; Danny was around fourteen years old at the time, and all the other kids went to his house because "nobody cared what went on there."  Smith's house was about fifteen minutes away from where the body was found.

During the course of his investigation, Detective Anders spoke with other persons there that night, including Jeff Stealey and Casey Nelson.  Each of

15

them gave voluntary statements denying any knowledge of what happened that night. Detective Anders also talked to Horton, Alisha Grammer—who was Stealey's girlfriend at the time, and Robert Tedford, whose truck was used to take Schraer to the field where his body was found. After speaking with all of these people, Detective Anders felt there was enough information to charge only appellant, Stealey, and Nelson. According to Detective Anders, the Lewisville police did not charge Horton in Schraer's death because the investigation showed that although Horton was in the backyard when the incident started, he did not go in the truck with appellant, Stealey, and Nelson, nor was he at the field where they dumped Schraer.

Grammer identified appellant in a photo lineup as the person who struck Schraer in the head, either with a pipe or baseball bat. She did not testify at trial, however.

Robert Tedford testified that he stayed at Smith's house frequently in 1997 and that he often loaned his truck to Nelson, Horton, and Stealey. Tedford recalled that some of "the guys" had gotten together to "take issue with [Schraer] . . . beat him up, whatever" because they believed he sexually assaulted a twelve-year-old girl, who was Horton's girlfriend's little sister. Specifically, they discussed beating him with poles and killing him. Tedford could not remember whether appellant was present during this discussion. He

16

did remember that Nelson, Horton, Stealey, and Robbie Moss were there. Tedford took issue with their plans because he had been falsely accused of sexual assault in the past. Tedford eventually left the backyard where everyone was talking and went inside the house. He never saw Schraer that night or ever again. The next day, everyone was acting strangely, not talking about anything, and Nelson told Tedford what had happened. Tedford found out the next day that his truck had been used; it was clean, but he did not think that was unusual. Tedford had known Schraer was dead since 1997. When asked why he had not come forward, he said he was scared because, in his words, "I know the people involved. I mean, they did it once, why wouldn't they do it again?"

**Horton's Version of Events**

Randall Horton testified that in September 1997, he was staying at Smith's house. Appellant had been there a couple of times. He was a newcomer to the group; "[h]e wasn't a regular." Horton was friends with Stealey and Nelson.

Horton testified that he was at the party where Schraer had allegedly raped Horton's girlfriend's sister. At one point, Schraer was alone in a room with her, but Horton did not know what had happened until a few days later when his girlfriend told him what had happened. She also told Stealey and

17

Nelson. Horton confirmed that the guys that "hung out" at Smith's house talked about killing Schraer, "[j]ust, [t]ake him out, just beat him to death somewhere, leave him on the side of the road." Horton said that he, Nelson, Stealey, appellant, and Grammer were there and that appellant "was pretty violent, pretty mad." According to Horton, appellant said he had to "take out" Schraer and that he was so mad about the situation because appellant's sister had been molested. The group talked about taking Schraer to a campground, chaining him to a campsite there, and telling "D," a man with whom Schraer had fought a couple of times, where he was. There was also some discussion about waiting to find out what happened, "backing off."

The group did not see Schraer until the next day. He went to Grapevine Lake with a group that included Horton, Nelson, and Stealey. That night, Schraer was at Smith's house with "the same people . . . [who] were hanging out together after the hotel party." For the most part, people acted like nothing had ever happened. At one point, Stealey poured a beer down the side of Schraer's head and said, "This is for my dead homies." Horton did not think anything of it because "it was just talk."

Horton said that at Smith's house one night, Nelson said, "If anything is going to be done, it's got to happen right now." Horton, Nelson, Stealey, Schraer, Grammer, and appellant were all there. At some point, appellant

18

picked up a three-foot-long, black, metal pipe that was against the fence and started swinging it like a baseball bat. He "walked over behind [Schraer] and then . . . walked back and forth a couple of times." Appellant was swinging the pipe for about fifteen or twenty minutes. Then, appellant walked back over toward Schraer; Nelson "nodded his head like a twitch, kind of," and appellant hit Schraer in the back of the head. Schraer was seated at the time with his back to appellant.

According to Horton, appellant swung the pipe hard, and "[y]ou could hear it hit." Schraer had his hands in front of his body; said, "Oh shit"; and hit his head on the table. Nelson then grabbed Schraer's foot, dragged him by his feet through the backyard and alley, and put him into the bed of the truck with appellant's help. Horton saw appellant in the bed of the truck, and he saw Nelson get in the driver's seat. He saw Stealey grab the handle of the passenger side door of the truck, but he never actually saw him get in.

Horton and Grammer walked over to her car and got in. They drove to the campsite that had originally been suggested as a place to leave Schraer, but they did not see anything there and did not go in. Grammer took Horton back to Smith's house, and appellant, Nelson, and Stealey showed up in the truck fifteen or twenty minutes later. They told Horton they had taken Schraer to the side of the highway. Appellant told Horton he had to keep hitting Schraer to

19

keep him from trying to get out of the truck. When they pulled over to the side of the road, the three took turns hitting Schraer; Stealey went last. Stealey told Horton that before he hit Schraer the last time, Schraer looked at him and said, "Why are you doing this to me?" According to Horton, Stealey was angry but laughing, and appellant was calm, as if nothing had happened.

Horton said that Stealey and Nelson told the group that if "anything was said, . . . everybody goes down together." Appellant said he would do whatever it took to stay out of prison. Horton was scared of the three because they said that if anybody told what they knew, they would be killed. Horton saw blood in the driveway when the three returned. Nelson and Stealey made Horton come with them to wash the truck, but he did not see any blood in the truck or on the two men. Appellant stayed behind at the house, and Horton never saw him again until trial. Either the next day or a few days later, Horton asked to see where they had left Schraer; Stealey took him to a place "off of 35 by Phil Dill Boats." He saw a body that was "[b]eat up pretty bad" with the face caved in. There was a Cowboys jersey on it, which was what Schraer had been wearing the night before.

When Horton saw on television that the police had found a body off of 407 and 35, he knew who it was. But he did not talk to police about that night's events until 2006 when he was interviewed by Ranger Murphree and

20

Detective Anders. He gave an initial statement, and two days later he was arrested for a parole violation unrelated to the case. While he was in jail, he gave a more detailed statement to Detective Anders.

On cross-examination, Horton testified that he had participated in the discussions about harming Schraer. In his initial statement to police, he said that Nelson had nodded his head, no, when appellant was swinging the pipe; however, at trial, he admitted that he was contending that Nelson was encouraging appellant to hit Schraer, in contrast to his initial statement. Additionally, in his initial statement, he said appellant had dragged Schraer to the truck; appellant testified that his statement was incorrect in that respect.

**Stealey's Version of Events**

Stealey testified next, and told the jury that the murder charges against him were pending and that the State had not promised him anything for his testimony. Stealey testified that he attended the hotel party where Schraer had allegedly raped the twelve-year-old girl; appellant and Nelson were not there. He confirmed that he heard about the alleged rape after the party. He also confirmed that there was an informal gathering and discussion about it where they discussed that "something [had] to be taken care of." Stealey took it to mean that they were going to beat up Schraer.

21

Stealey corroborated Horton's testimony that appellant said his sister had been raped and no one had done anything about it. He and Nelson, Horton, Schraer, Grammer, and appellant were in the backyard the night appellant hit Schraer. Schraer was seated by himself at the table, and everyone else was standing around. Appellant was behind a tree. Stealey went to sit at the table, and appellant shooed him away, so he moved. After that, appellant "came charging out with a black pipe and struck [Schraer] in the back of the head . . . . like he was trying to take his head off." According to Stealey, Schraer never saw appellant; when he was hit, he said, "Oh, and then the F word," and then his head hit the table.

Schraer was completely knocked out after appellant hit him. Stealey testified that Nelson dragged Schraer to the truck by the ankle of his pants; appellant jumped into the back of the truck, Nelson hopped in the front, and Stealey got in back with appellant. While they were driving away from Smith's house, Schraer woke up, and appellant started hitting him again with the pipe. Appellant hit Schraer in the back of the head and the middle of his back. Stealey said Schraer asked, "Why are you doing this?", while they were in the back of the truck.

Appellant hit Schraer several times in the back to prevent him from getting out of the truck. At this point, Schraer's face was covered in blood,

22

"and he was breathing real heavily and choking." They drove around for about fifteen or twenty minutes. At one point, Stealey shoved Schraer away from him with his foot. Appellant kept hitting Schraer, about fifteen times. Schraer was fighting for his life. Halfway through the ride, appellant hit Schraer in the face with the butt end of the pipe. When they arrived at the field, Schraer was not breathing or making any noise. His face was "completely smashed." They dumped his body out. Appellant hit Schraer three or four more times, and Stealey hit him twice with the pipe. They left appellant in the field covered with some brush.

The truck was full of blood, so on the way back to Smith's house, they drove the truck through a car wash on 407. They then put the pipe in a trash can at a convenience store. Stealey recalls being very emotional and horrified at what had happened. Back at Smith's house, he remembers there "being talk of we're all going to keep silent about this or join him." Stealey said that he never said anything because he was scared of the people involved and of being taken away from his family to go to prison. He corroborated Horton's story about looking at the body.

On cross-examination, Stealey admitted that he had received a letter from the State indicating that he had agreed to cooperate with the State in exchange for some type of plea bargain, but he did not know the terms of the plea

23

bargain at the time of trial. According to Stealey, appellant had told Schraer on the way to the lake that he was going to have to kill him for something Schraer had said and appellant was the person who had poured liquor on Schraer, saying, "This is for my dead homies."

Stealey admitted that with regard to what happened that night, "it gets down to his [appellant's] word or [Stealey's] word." Stealey agreed that appellant was enraged and out of control, on a "real emotional high," when he was beating Schraer in the back of the truck. He admitted hitting Schraer "pretty hard" across the front of his body after he had stopped moving and making noise. He did not remember going to the car wash a second time, but he remembers Horton telling him about a second car wash because there was brain matter in the truck.

**Appellant's Version of Events**

After the State rested, appellant testified. Appellant was about nineteen years old in September 1997. According to appellant, he was at the party where Schraer allegedly raped the twelve-year-old girl. Everybody was either drinking, smoking marijuana, or doing other drugs. A couple of days after the party, when he went to Smith's house, Stealey, Nelson, Horton, and Grammer were in the backyard and really upset. According to appellant, they were ranting and raving. When he asked what had happened, they told him Schraer

24

had raped the little sister of Horton's girlfriend and they were discussing what they were going to do. Randy and Grammer said they were going to "kick his butt," and Stealey said "that mother f'er is going to pay."

Appellant testified that the rest of the group was talking about beating up Schraer, and he told them they should confront him and find out what happened first. According to appellant, someone then went to get Schraer and sat him at the table. Appellant said that Grammer and Horton started screaming and yelling at Schraer, calling him a "molesting piece of . . . S-H-I-T." Appellant testified that Schraer at first denied their allegations, and Horton told Schraer they were going to "beat his ass" if he did not start talking. Appellant said that he went along with it and started screaming and yelling at Schraer. When appellant asked why he did it, Schraer answered, "That little bitch had it coming. She deserved it." After that, appellant hit Schraer. Appellant did not know what he hit Schraer with, but he "just grabbed something and hit him." He said he did not swing the object like a bat, but he just hit Schraer after he said what he did.

Appellant said that after he hit Schraer, Schraer started to fight, and he and Nelson grabbed him and dragged him to the truck. Appellant admitted that he and Stealey got in the back of the truck, and Nelson drove. Appellant and Stealey held Schraer down in the truck bed. After a car drove up behind them,

25

appellant told Stealey they should just drop off Schraer and tell him to get out of there, but Stealey told him no. About that time, Schraer jumped up and started swinging, and appellant's reaction was to grab his legs. According to appellant, Stealey grabbed Schraer's torso and body-slammed Schraer to the ground. Appellant admitted to hitting Schraer a couple of times in the face with his fists, but he said at that point, Stealey grabbed the pipe and started hitting Schraer.

Appellant testified that when they got to the field, Stealey got Schraer out and kept hitting him with the pipe while appellant just watched. According to appellant, Nelson asked what Stealey was doing because he just thought they were going to beat up Schraer. Appellant said he was going to leave and not be a part "of this" anymore, and that at that point, Stealey threatened him with death if he left. Stealey then hit Schraer two or three more times, "and then the last hit he did was a golf swing right across the side of his head."

Appellant testified that Schraer was alive when he hit him in the face with his fists in the truck. According to appellant, Stealey washed the truck after they left the field. When they got back to Smith's house, Stealey told everyone that he would kill them if they told what had happened because he had already killed once. Appellant said Stealey was bragging to everyone that he had "killed

26

[Schraer] with the pipe and how he had done a golf swing across the side of his head."

Appellant admitted that he initially lied when the police first questioned him about the murder, partly because he "was trying [his] desperate best to not remember, and . . . [he] was scared to actually be put in jail." He told them that Horton had been in the truck because the event had happened a long time ago, and he was confused. According to appellant, he only thought they were going to "beat [Schraer] up, drop him by the highway, [and] tell him to get lost." However, he knew Schraer was going to die "from being beaten with that pipe." When he tried to walk away at the field, the only thing on his mind was getting away from the situation.

On cross-examination, the State impeached appellant by pointing out that he had previously lied in a hearing before the court by testifying that he asked for a lawyer but did not get one when Ranger Murphree and Detective Anders first questioned him even though the tape of the entire interview revealed that he did not make such a request. In addition, the State was able to point out the inconsistency in appellant's testimony that he would never forget such a traumatic event with his explanation of why he kept leaving out details because he could not remember them from ten years ago. Although appellant denied hitting Schraer to keep him in the back of the truck, he admitted that Horton

27

told the group that that is what had happened. Although appellant agreed when the State said that even if all he said was true he was still guilty under the law of parties, appellant denied intending to kill Schraer; he said he only wanted to hurt him and beat him up for raping a twelve-year-old girl.

**Medical Testimony**

Dr. Austin had testified earlier about the nature of the injuries that she deduced from Schraer's remains. According to Dr. Austin, the base of the skull showed blunt force trauma occurring around the time of death; in other words, it could not have been caused by the construction equipment. Dr. Austin testified that the blow was significant, not a "light tap." "It would be a blow with some type of a weapon. You know, it could be a board, it could be a baseball bat. . . . It would be something that would be fairly heavy, and it would have been swung with purpose, you know, with a purpose to hit someone hard." Dr. Austin also found indications of multiple blows to the head, but because of the construction equipment that had been used, she could not be sure what exactly caused that trauma.

Dr. Mark Krauss, Deputy Chief Medical Examiner in the District Medical Examiner's Office in Fort Worth, also examined Schraer's remains. He testified about the nature of the wound to the back of Schraer's head. According to Dr. Krauss, there was a "complete fracture, . . . depressed, shoved inward to the

28

inner part of the skull." By a complete fracture, Dr. Krauss meant that it went through the entire skull to the brain. Dr. Krauss agreed that striking someone in the head with a blunt object, such as a metal pipe, to the extent that such a fracture resulted, would be an act clearly dangerous to human life. He also testified that a blow to that part of the head is especially dangerous because there are "a couple of major arteries that run on the inside of the skull." According to Dr. Krauss,

> If you fracture the skull, it causes a shearing across that artery. Most of the time it tears it and damages it somehow. If you get bleeding from that artery, it very rapidly elevates the dura, the lining inside of the skull, and starts pushing it away and causes a localized massive effect. If you even get half of a golf ball worth of hematoma there, it's potentially fatal. If you get any bigger than that, it is fatal.

Dr. Krauss opined that the cause of Schraer's death was blunt force trauma to the head and that the blow came from "relatively behind" Schraer.

**Applicable Law**

Penal code section 6.03 defines the intentional and knowing mental states as follows:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his

29

conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(a), (b) (Vernon 2003).

Intent can be inferred from the acts, words, and conduct of the accused. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995), *cert. denied*, 517 U.S. 1106 (1996). It can also be inferred from the means used and the wounds inflicted. *Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. [Panel Op.] 1981); *Yanez v. State*, 199 S.W.3d 293, 311 (Tex. App.—Corpus Christi 2006, pet. ref'd). Intent may also be inferred from acts indicating a consciousness of guilt. *See Claxton v. State*, 124 S.W.3d 761, 766 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *cf. Montgomery v. State,* 810 S.W.2d 372, 396 (Tex. Crim. App. 1991) (op. on reh'g) (noting that appellant's intent to arouse and gratify his own desire could be inferred by his consciousness of wrongdoing, as evidenced by his telling children not to reveal to anyone what had happened).

**Analysis**

Appellant contends that the evidence shows that Schraer died from multiple blows and that there is no showing that the one blow to Schraer's head is what killed him. Additionally, appellant contends that there is

30

insufficient nonaccomplice evidence to prove that he intentionally or knowingly killed Schraer.

Appellant admitted that he hit Schraer with something from the backyard, and he admitted wanting to hurt Schraer at the time. He also admitted that Schraer was sitting down when he hit him. Grammer, whom none of the men implicated as being involved in the beating or activities afterward, identified appellant as the one who initially hit Schraer. Dr. Krauss testified that the blow to the back of Schraer's head was so deep, it depressed the skull all the way through to the brain and that such a blow would have been sufficient to kill Schraer. Appellant also admitted to assisting Stealey in trying to keep Schraer in the back of the truck.

We conclude and hold that there is both legally and factually sufficient nonaccomplice evidence to support a conclusion that appellant intended to kill Schraer, as evidenced by the nature of Schraer's head injury and the force that would have been needed to accomplish such an injury. Additionally, there is also legally and factually sufficient nonaccomplice evidence to support a conclusion that appellant intended to cause serious bodily injury to Schraer, and in the course of doing so, committed an act clearly dangerous to human life. Accordingly, we overrule appellant's second and third points.

31

**Alleged Jury Charge Error**

In his fourth and fifth points, appellant contends that the trial court erred by refusing to instruct the jury on the lesser included offenses of aggravated assault and manslaughter. In his seventh point, appellant claims the trial court erred by refusing to instruct the jury on sudden passion at punishment.

The trial court need not submit a lesser included instruction sua sponte if neither side requests one. *See Delgado v. State*, 235 S.W.3d 244, 249–50 (Tex. Crim. App. 2007). Moreover, the defense may not claim error successfully on appeal due to the omission of a lesser included offense if the defense did not request one. *Id.* at 250. Likewise, the trial court has no duty to sua sponte instruct the jury on defensive issues, such as sudden passion. *Posey v. State*, 966 S.W.2d 57, 61–62 (Tex. Crim. App. 1998); *see Trevino v. State*, 157 S.W.3d 818, 821–22 (Tex. App.—Fort Worth 2005, no pet.) (explaining that sudden passion is defensive issue).

Here, neither appellant nor the State requested instructions on aggravated assault, manslaughter, or sudden passion. Accordingly, the trial court was not required to give these instructions to the jury sua sponte. We overrule appellant's fourth, fifth, and seventh points.

**Lack of Accomplice Instruction**

In his sixth point, appellant contends that the trial court erred by failing to include an instruction that a conviction cannot be based on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). The State concedes that the charge should have included such an instruction but that the omission of the instruction was harmless.

**Standard of Review**

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32.

If there is error in the court's charge but the appellant did not object to it at trial, we must decide whether the error was so egregious and created such harm that appellant did not have a fair and impartial trial—in short, that "egregious harm" has occurred. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g); *see* TEX. CODE CRIM. PROC. ANN. art. 36.19 (Vernon 2006); *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996). In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested

issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Hutch*, 922 S.W.2d at 172–74. The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *Hutch*, 922 S.W.2d at 171.

**Analysis**

Nonaccomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve. *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). A harmless error analysis for the omission of an accomplice witness instruction should be flexible, taking into account the existence and strength of any nonaccomplice evidence and the applicable standard of harm. *Id*. According to the court of criminal appeals,

> [i]n determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime. Under *Almanza v. State*, 686 S.W.2d at 157 (Tex. Crim. App. 1984), the appropriate harm analysis depends upon whether the defendant preserved error by bringing the improper omission to the trial court's attention. . . . [W]hen the

34

defendant has failed to preserve error, he must show egregious harm. . . .

> Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."

*Id*. at 632.

Here, we have already determined that sufficiently convincing nonaccomplice evidence corroborated the accomplice testimony. Thus, we conclude and hold that the trial court's failure to include an accomplice testimony instruction was harmless in this case. We overrule appellant's sixth point.

## Conclusion

Having overruled all of appellant's points on appeal, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

PUBLISH

DELIVERED: August 7, 2008

35