**Opinion filed November 8, 2012**



# In The

# Eleventh Court of Appeals

_____

## No. 11-10-00335-CR

_____

## JAN DAVID CLARK, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 244th District Court**

**Ector County, Texas**

**Trial Court Cause No. C-35,136-T**

## M E M O R A N D U M   O P I N I O N

The jury convicted Jan David Clark of the offense of murder and assessed his punishment at confinement for life and a fine of $10,000. We affirm.

The decedent in this case was Susan Clark, appellant's wife.

Appellant testified that, on the evening of January 31, 2008, he had been to a business meeting with other people who were involved in the multi-level sale of nutritional supplement products known as Enzacta. Appellant's wife was not in the business with him and did not attend the meeting; she stayed at home. Appellant got home "about 10:30 [p.m.]." He intended

to perform an exorcism on Susan that night to rid her of a demon, but he felt like it had to be done at the right time. He had never performed an exorcism before. He stayed in his office at his house until 10:55 p.m. and then went to the bedroom. Susan was already in bed. When appellant began saying, "holy, holy, holy, Lord God Almighty," Susan ran to the bathroom to "avoid me laying my hands on her head." She dialed 911, but he took the phone away from her when he followed her into the bathroom.

The dispatcher for the City of Odessa received that incomplete 911 call. When the call came in, the city's caller identification system registered appellant's name and address and recorded the time as 11:04 p.m. The dispatcher gave the information to Ector County Sheriff's Office personnel. Deputy Victor Tercero responded and went to appellant's house. A few minutes later, Sergeant Mike Griffis joined him there. The officers knocked on doors and looked through windows into lighted rooms of the house but saw nothing to indicate anything out of the ordinary, so they left.

However, the bathroom into which appellant followed Susan could not be seen by looking through the windows of the house. After appellant followed Susan into the bathroom and terminated the 911 call, he "laid hands" on her head. According to appellant, at the point that he "laid hands" on Susan, he just lost control of himself. He testified that she fought against him. She eventually ended up facedown on the floor, and appellant was sitting on her backside and was straddling her. He remembered "hearing her say clearly, 'I can't breathe.'" Appellant testified that he continued to hold her down and that he smothered her.

From the time that appellant "laid hands" on Susan and lost control of himself, he began to chant, and the chanting "went on until through the whole situation." In a video statement to law enforcement officials, appellant said he felt that his own body had been overcome with the spirit of a Cherokee witch doctor. By his own testimony, appellant became sexually aroused, pulled up Susan's shirt, and pulled down her panties. "There was a kind of vision like riding a horse and a bunch of wild Indian sounds and more chanting and whooping." He rolled her over, and when he saw her face, "the whole chanting thing was gone." Before the deputies arrived, appellant put a white sheet over Susan, poured grape juice over her, and placed three crosses on her body. He called for neither an ambulance nor any other help for Susan.

Appellant did, however, call his friend, Stephen Culver, at approximately 3:15 a.m. on February 1. Culver did not answer the telephone in time, but he did listen to the message that

appellant left and returned the call to appellant. Culver did not testify as to the content of the conversation, but he did testify that, after he talked to appellant, he and his wife became concerned and decided to contact law enforcement personnel.

One of the Culver's employees was married to Phillip Partin, an FBI agent; they decided to call him. Agent Partin arrived at the Culver's home around 4:20 a.m. Culver rode with Agent Partin so that Culver could show the agent where appellant lived. By arrangement, "Odessa law enforcement" followed them. They arrived there at about 5:00 a.m. and merely pointed out appellant's house to the deputies and left. Agent Partin testified and confirmed Culver's testimony.

Five and one-half to six hours after he had been to appellant's house the first time, Deputy Tercero was dispatched to the house again. Lieutenant Luffman, Sergeant Griffis, and Investigator Trujillo met him there. Deputy Tercero testified that, when he went back to the house the second time, a pickup had been moved from under the carport, and its engine was warm. A light in the carport that had not been burning at his first visit to appellant's house was now on. Appellant testified that he moved the pickup out of the carport after he killed Susan so that a receiver inside the house could pick up and play Christian music from a satellite radio broadcaster in the vehicle. Although appellant usually had "about eight beers a night" and smoked "a couple of puffs a day" of marihuana from his pipe, he had not done so the night of the homicide.

When the deputies made the second trip to appellant's home, Investigator Trujillo knocked on the door to the house, and appellant answered. When the officers entered the residence, they found Susan lying dead on the master bathroom floor. Investigator Trujillo "read [appellant] his rights." Sergeant Griffis placed appellant in the sergeant's patrol unit. Appellant was taken to the detention center.

At the time that appellant killed Susan, Steven John McNeill was an investigator for the Ector County Sheriff's Office. Investigator McNeill was at his home on the morning of February 1, 2008, when he received a call to assist in an investigation. He and another investigator interviewed appellant at approximately 7:30 that morning. A video was made of the hour-long interview, and it was played for the jury. Although there were some inconsistencies, appellant told the investigators essentially the same thing that he related during the trial.

3

At the time of this homicide, Christin Timmons was a sexual assault nurse examiner at Medical Center Hospital's emergency room. She examined Susan on February 1, 2008. She found multiple bruises on Susan's body, ruptured blood vessels, and abrasions on her nose. Timmons also found four "pretty new" abrasions on Susan's labia minora, indicating that "[s]omething of a harder substance rubbed against it causing some friction." Appellant denied having any sexual activity with Susan since 2000.

Dr. Lloyd White, a board certified forensic pathologist, testified that he was self-employed as a contract pathologist for the Tarrant County Medical Examiner's District in Fort Worth. He had been appointed as a deputy medical examiner there. He performed autopsies for Ector County at the request of the Ector County Medical Examiner.

On February 2, 2008, Dr. White performed an autopsy on Susan's body. He found that Susan had an abrasion on her nose and that she had multiple bruises, including defensive bruises that would indicate that Susan struggled and put up a fight. Dr. White also noted the injury to the labia minora that Timmons had noted during her examination. That injury was consistent with assaultive behavior. As did Timmons, Dr. White also noticed "a lot of petechiae." Petechiae are small hemorrhages in a person's skin and "are typically associated with increased vascular pressure in the chest and with hypoxia or lack of air and oxygen to the organs and tissues of the body." Petechiae typically accompany traumatic asphyxia. Dr. White noted "very prominent petechiae on the face, the membranes of the eyes and some areas of the upper torso and on the arms." Dr. White was of the opinion that the cause of death was "asphyxia by smothering" and that the manner of death was homicide.

Appellant does not claim that he did not smother his wife to death. However, he maintains that he did not intend to cause her death or to cause her serious bodily harm; he was trying to perform an exorcism to rid Susan of a demon that he thought she had. That is the subject of appellant's second point of error, in which he argues that the evidence is insufficient to show that he intentionally or knowingly caused Susan's death or that he engaged in conduct that led to her death. It is appellant's position that the evidence "would simply show an accident that resulted in his wife's death."

We review a sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd).

4

Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

As Susan's murder was charged in this case, it was incumbent upon the State to prove beyond a reasonable doubt that appellant either intentionally or knowingly caused Susan's death or that he intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused Susan's death. TEX. PENAL CODE ANN. § 19.02 (West 2011).

Mental culpability is of such a nature that generally it must be inferred from the circumstances under which the prohibited act occurred. *Griffith v. State*, 315 S.W.3d 648, 651 (Tex. App.—Eastland 2010, pet. ref'd). The trier of fact may infer a culpable mental state from the acts, words, and conduct of the accused. *Id.* The factfinder may also infer intent from acts that indicate a consciousness of guilt. *Mashburn v. State*, 272 S.W.3d 1, 14 (Tex. App.—Fort Worth 2008, pet. ref'd).

Appellant selected the exact time that he confronted Susan. He chased her into the bathroom. He did not want her to make the 911 call, and he terminated it. He did not answer the door when the officers first responded to the incomplete 911 call. He did not call 911 or seek any outside medical help for Susan, although he moved his vehicle so that he could listen to Christian radio. He made a conscious decision not to call the police. He said that he did not call 911 because he did not want to go to jail. He told Culver not to call 911 because he did not want to go to jail.

Susan had an abrasion on her nose and had suffered multiple bruises, including defensive bruises that would indicate that Susan struggled and put up a fight. There were "a lot of petechiae" on Susan's body. The petechiae were very prominent on Susan's face, the membranes of her eyes, and some areas of her upper torso and arms. There was an abrasion injury to the labia minora. That injury was consistent with assaultive behavior. Appellant denied having sex with Susan since 2000. However, when pressed, he testified that it was possible that the sexual abrasions suffered by Susan could have happened during his horse-riding vision.

We hold that, when we examine all of the evidence in this case in the light most favorable to the verdict, together with the reasonable inferences from it, a rational trier of fact could have

found the essential elements of the offense beyond a reasonable doubt. Point of Error No. Two is overruled.

In his first point of error, appellant maintains that the autopsy on Susan's body was performed by an unauthorized person and that, therefore, the trial court erred when it denied his motion to suppress the autopsy results.

Dr. White, a board certified forensic pathologist, testified outside the presence of the jury. As we noted earlier, Dr. White performed the autopsy upon Susan's body. He told the trial court that he was self-employed and that he performed contract pathology services for Dr. Nizam Peerwani, the chief medical examiner of the Tarrant County Medical Examiner's District. Dr. Peerwani appointed Dr. White as a deputy medical examiner. The district includes Parker, Denton, Johnson, and Tarrant Counties. Dr. White testified that he has never been a medical examiner for Ector County. However, Dr. Peerwani had entered into a relationship with Ector County whereby he was a deputy medical examiner of Ector County.

At the hearing on appellant's pretrial motion to suppress, Dr. Nathan C. Galloway testified that he was the duly appointed medical examiner for Ector County at the time that Dr. White performed the autopsy on Susan Clark. However, there were no facilities in Ector County in which he could perform autopsies, and he did not perform the autopsy on Susan's body. Dr. Galloway testified that Dr. White worked for the Tarrant County Medical Examiner's District, with which Ector County had an agreement, although he did not testify about the specific details of that agreement. The trial court overruled the pretrial motion to suppress, made the same ruling at trial, and admitted the autopsy results into evidence.

When we review a trial court's ruling on a motion to suppress, we will do so for an abuse of discretion. We will overturn the trial court's ruling only if it is outside the zone of reasonable disagreement. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011). We will apply a bifurcated standard of review and will give almost total deference to a trial court's determination of historical facts and mixed questions of law and fact that rely upon the credibility of a witness. However, we will apply a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.*

Appellant's assertion finds its basis in TEX. CODE CRIM. PROC. ANN. art. 49.25 (West Supp. 2012). Article 49.25 provides, among other things, for the organizational structure for the office of medical examiner. Even if we were to assume that there was no compliance with that

6

organizational structure in this case, we are of the opinion that noncompliance does not affect the admissibility of the autopsy results. We agree with the Fort Worth Court of Appeals that Article 49.25 does not contain any provision that provides for the exclusion of evidence arising out of an autopsy that was not performed in accordance with the structure of Article 49.25. *Gower v. State*, No. 02-10-00362-CR, 2011 WL 4916438 (Tex. App.—Fort Worth Oct. 13, 2011, no pet.) (mem. op., not designated for publication); *see* TEX. CODE CRIM. PROC. ANN. art. 38.23 (West 2005).

As far as separate exclusionary rules are concerned, the Fort Worth court in *Gower* addressed a similar question and quoted from *Wilson v. State*, 311 S.W.3d 452, 458–59 (Tex. Crim. App. 2010), wherein the court said, "The underlying purpose of both the federal exclusionary rule and article 38.23 is the same: to protect a suspect's privacy, property, and liberty rights against overzealous law enforcement. As such, both exclusionary rules are substantive in nature, as they provide a remedy for the violation of those rights." Therefore, one may not invoke the rule for violations not related to the purpose of the rule "or to the prevention of the illegal procurement of evidence of crime." *Wilson*, 311 S.W.3d at 459.

Furthermore, we find it instructive that the Texas Court of Criminal Appeals has held that, "as a general rule, medical examiners are not considered 'other law enforcement personnel' under Rule 803(8)(B) [of the Texas Rules of Evidence] as far as their duties relate to the preparation of autopsy reports." *Garcia v. State*, 868 S.W.2d 337, 342 (Tex. Crim. App. 1993). Appellant here has not shown how a failure to follow the organizational structure of Article 49.25 is related to a violation of his rights or how the application of the exclusionary rule in this case would serve to meet the purposes of the rule. *See Watson v. State*, 10 S.W.3d 782, 784 (Tex. App.—Austin 2000, no pet.) (stating that the main purpose of the exclusionary rule is to deter unlawful acts that violate the rights of criminal suspects and citing instances in which courts have declined to apply Article 38.23 to alleged statutory violations). Point of Error No. One is overruled.

In his third and final point of error, appellant claims that he was denied effective assistance of counsel because trial counsel failed to present any witnesses or evidence at the punishment phase of the trial.

To prevail on a claim of ineffective assistance of counsel, an appellant must establish that his lawyer's performance fell below an objective standard of reasonableness and that there is a

7

"reasonable probability" the result of the proceeding would have been different but for counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 693–94 (1984); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986). The purpose of this two-pronged test is to judge whether counsel's conduct so compromised the proper functioning of the adversarial process that the trial cannot be said to have produced a reliable result. *Thompson v. State*, 9 S.W.3d 808, 812–13 (Tex. Crim. App. 1999).

The review of defense counsel's representation is highly deferential and presumes that counsel's actions fell within a wide range of reasonable professional assistance. *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Jackson v. State*, 877 S.W.2d 768 (Tex. Crim. App. 1994); *Hayden v. State*, 155 S.W.3d 640, 648 (Tex. App.—Eastland 2005, pet. ref'd). When the record is silent on the motivations underlying counsel's tactical decisions, the appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable. *Thompson*, 9 S.W.3d at 813. In order to defeat *Strickland*'s presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* at 814 (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). We do not inquire into trial strategy unless no plausible basis exists for trial counsel's actions. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. 1981). When the record contains no evidence of the reasoning behind trial counsel's actions, we cannot conclude that counsel's performance was deficient. *Jackson*, 877 S.W.2d at 771.

Appellant has failed to name any witness who was available and whose testimony would have benefited him. A claim of ineffective assistance of counsel can be based upon an attorney's failure to present witnesses only if the appellant can demonstrate that such witnesses were available and that their testimony would have been of benefit to him. *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). Appellant's third point of error is overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT

CHIEF JUSTICE


November 8, 2012

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Gray, C.J., 10th Court of Appeals.[1]

---

[1]Tom Gray, Chief Justice, Court of Appeals, 10th District of Texas at Waco, sitting by assignment to the 11th Court of Appeals.