

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

NO. 2-08-312-CR

JOHN YOUNG                                                          APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

Appellant John Young brings nine points in this appeal from his conviction by a jury for two counts of aggravated kidnapping, enhanced by two prior felony convictions. We affirm.

---

[1] ... *See* Tex. R. App. P. 47.4.

Legal and Factual Sufficiency

Because appellant challenges the legal and factual sufficiency of the evidence in his eighth point, we review that point first.

Background Facts

Carlton Adger testified that on the night of February 22, 2006, he and his girlfriend, Sharice Brodie, were driving northbound on I-35 on their way to Denton. Carlton was sleeping. Sharice woke him because two cars driving next to them looked as if they were about to wreck. One of the cars, a Suburban, was going fast and swerving; it collided with a Honda next to it and ran up against the median.[2] Carlton identified photographs of the Suburban offered by the State. Carlton had Sharice pull over so that they could check and see if anyone in the Suburban had been injured.

Sharice stayed in the car while Carlton started walking toward the Suburban. At that point, Carlton saw someone he later identified as appellant "come from around the [S]uburban and jog, then . . . slow[] down like a fast walk, . . . and approach[]" him. Carlton said appellant was in a big hurry, as if he were trying to get away from the scene. Appellant seemed to be in a

---

[2] The wreck occurred near the intersection of I-35 and the George Bush tollway in Carrollton.

state of shock, and he told Carlton to "[g]et back in the car."[3]  As appellant

said this, he was holding his hand up and had something covering it; he waved

his hand as if he had a gun.  Carlton could tell "it wasn't his finger because it

was something that stopped short in [a] towel or a shirt or something . . . and

made it seem as if he had a weapon."  The towel was stiff, stuck out, and

didn't move.  Carlton believed appellant had a gun, but he did not actually see

a gun.

After Carlton realized that appellant had what he thought was a gun,

Carlton became afraid.  If appellant had concealed a gun under the towel, the

barrel would have been pointing at Carlton.  Carlton got back in the passenger

side front seat, and appellant got into the passenger side back seat.  Carlton

told Sharice to drive, and they drove for about five to seven minutes.  She

drove to the La Quinta in Lewisville, off Corporate Drive.  Carlton had

suggested to appellant that they could let him out there just to get him out of

the car.  Appellant said, "[F]ine.  Okay."[4]  Then he darted out of the car and

---

[3] It appears from Carlton's testimony that appellant said this twice, but it is unclear in exactly what sequence appellant told Carlton to get back in the car.  However, Carlton's testimony makes it clear that he felt he had no choice but to get back in the car because he thought appellant was threatening him with a gun.

[4] Carlton had the impression that appellant did not have a particular destination in mind but rather just wanted to be away from the scene.

said thank you. According to Carlton, appellant "pretty much was trying to, basically, get away."

As they drove, appellant kept saying, "[M]y partner is going to be mad at me, I done wrecked his car." Appellant smelled strongly of alcohol. Carlton realized, based on appellant's level of agitation, that he must have done something else wrong other than a hit and run. It made him scared.

Carlton identified State's exhibits 4 and 5 as the sports jersey and black pants appellant was wearing that night.

Sharice testified that around 11:00 on February 22, 2006, she was driving on I-35 near the intersection with the George Bush turnpike in Carrollton, when she saw an SUV behind her car; it came up on her car fast, swerved into the next lane, and hit the car in front of her. She identified the Suburban shown in State's exhibits thirty-three through thirty-five as the SUV. Sharice said that when the cars collided, the Suburban went to the left and the car went to the right. She pulled over to the left-side shoulder of the highway.

When Carlton got out of the car,[5] Sharice saw him walking toward the back; she could hear him asking the SUV driver if he was okay. She did not see anything unusual until Carlton got into the car, followed by appellant.

_____

[5] Sharice confirmed that she had awakened him right before the cars collided.

4

Appellant had his hand wrapped in "a towel or some kind of shirt" and he was carrying a Crown Royal bag. She could not say what was underneath, but she thought appellant had a gun and she was scared.

According to Sharice, appellant asked her and Carlton to hurry up and drop him off at La Quinta because he had a friend that lived in an apartment in the area.[6] He seemed nervous because he had wrecked the Suburban, which he had borrowed from a friend. He said he should not have fallen asleep at the wheel. He seemed to be in a hurry and smelled of liquor. It took about five to seven minutes for them to get to the La Quinta.

According to Sharice, the parking lot at the La Quinta was dark and no one was around; she was afraid because it was late and she was pregnant at the time.[7] She said although there was light shining on the hotel itself, there was not any in the parking lot where they were parked. When appellant got out, he was polite and hurried up and around the side of the building.

Gary Fernandez, a detective with the City of Carrollton police, investigated the offense against Carlton and Sharice. He obtained and executed

---

[6][...] When asked if Carlton told her when he got in the car, "Drive, let's go to La Quinta," Sharice said yes.

[7][...] In contrast, Carlton had testified that because the La Quinta was right off the main road, "if anything would have happened right there, . . . everybody would see."

a search warrant for the Suburban. He found evidence linking appellant to a robbery that had occurred at a Sonic in nearby Coppell immediately before the accident; specifically, he found a cell phone under the driver's seat that the robber had taken from the cook at the Sonic.[8] According to Detective Fernandez, there was no fingerprint evidence; he did not know if that was because the Suburban had not been dusted for fingerprints or if no prints were found. Detective Fernandez also confirmed that if Sharice had driven from the wreck to Lewisville, she would have crossed the county line from Dallas to Denton County.

Detective Scott Peters, a Coppell police officer, testified that he investigated the Sonic robbery and participated in the investigation of the offense against Carlton and Sharice. He obtained a search warrant for appellant's residence and also was present when police searched appellant's Mitsubishi. Lewisville, Carrollton, and Coppell police all worked together in handling the investigation. Detective Peters identified State's exhibits thirty-eight through forty-three as photographs of the Mitsubishi and items found in

---

[8] Detective Fernandez actually called the cell phone number that had been given to him by the detective investigating the Sonic robbery, and the recovered cell phone rang.

it: among them, a towel and a shoe box with a black bag containing money inside.

Detective Peters identified State's exhibit forty-four as a shoebox found in appellant's apartment; a BB gun was found inside. According to Detective Peters, the BB gun was similar to a .45 or 9 millimeter semiautomatic weapon in size, shape, and color. He testified that such a weapon is capable of causing death or serious bodily injury, depending on where the person was shot.

Detective Peters also testified that the jersey, pants, stocking cap, and hat police found in appellant's apartment matched those worn by the man in the surveillance video from the Sonic.

Detective Robert Feagins, a police officer for the City of Lewisville, testified that on February 22, 2006, he learned of a robbery at a Sonic in Coppell[9] with a gold Suburban involved. Based on the information he received, he went to a location in Lewisville where he met with the vehicle owner, Roosevelt Sanders, who admitted to having driven the Suburban that day.

Detective Feagins also spoke with Carollton police officers, who were talking to Carlton and Sharice; he had the officers and Carlton and Sharice come to a parking lot outside Sanders's workplace to see if Carlton and Sharice

_____

[9] ... The Sonic is located in Dallas County.

7

could identify Sanders as the person who had been driving the Suburban. They said he was not the same man. Detective Feagins then showed them "photo lineups [he] happened to have with [him] of an additional suspect."[10] He spread these photo arrays out on the trunk. One of the photographs was of appellant; Carlton and Sharice identified him as the driver of the Suburban.[11] This identification occurred approximately thirty minutes after the wreck.

Carlton and Sharice told Detective Feagins that they had been driving northbound on I-35 and that they had stopped for a wreck in front of them to see if anyone needed assistance. Appellant approached them with a towel over his hand as if he were trying to hide something under it and demanded that they give him a ride to Lewisville. Because they thought he had a handgun under the towel, and therefore felt threatened, they drove him to the La Quinta on I-35 in Lewisville, which was probably two miles away from where they stopped due to the wreck. In doing so, they crossed the boundary from Dallas

---

[10] The lineup, which was admitted into evidence, consists of six driver's license photographs, each around two inches by two inches. Detective Feagins testified that he had developed appellant as a suspect in two other incidents about two weeks earlier, which is why he had the photo array with him.

[11] According to Detective Feagins, they identified the photo of appellant simultaneously; he did not separate them for purposes of identifying their assailant.

8

County into Denton County, and most of the travel time occurred in Denton County.

Detective Feagins contacted a supervisor with the information that Carlton and Sharice had identified appellant, and Lewisville police officers later took him into custody. Detective Feagins interviewed appellant at the Lewisville Police Department. A recording of the interview was admitted into evidence at trial.

Appellant initially denied having been anywhere other than his apartment on February 22, 2006. However, he later admitted that Sanders had let him drive the Suburban and that he had had a wreck in it. He denied having a gun with him but admitted that he had asked Carlton and Sharice to "drop him off at the house" and that they drove him to the La Quinta.

Detective Feagins showed appellant the same photo array he showed the complainants, and appellant picked number 5 as the picture of himself, which is the photo Carlton and Sharice identified. The Lewisville police also searched appellant's vehicle, a green Mitsubishi, for evidence; they found money related to the Sonic robbery and a towel. The cash was in twenties and was banded with yellow stickies and thin white bands with a blue stripe. The detective testified that Sonic, not the police department, put the bands and stickies on the money. Detective Feagins testified that the towel fit the description given

him by the complainants. It was also large enough to cover a handgun if someone were holding one.

According to Detective Feagins, he was familiar with the route from the Sonic to the crash scene and that if a person were driving fast, it would take about eight minutes to make that drive.

On cross-examination, Detective Feagins admitted that appellant and Sanders were similar looking and that Sanders had initially lied and said the gold Suburban had been stolen. Nevertheless, he did not attempt to confirm Sanders's statements about his whereabouts during the time of the Sonic robbery.[12] Detective Feagins also affirmed that the Suburban was impounded by Carrollton police and that he did not order it to be searched to look for evidence in the charged kidnappings. But he did find out from the Carrollton investigator that a telephone had been found in the Suburban.

Detective Feagins acknowledged on redirect that there was no indication from any of the witnesses to the Sonic robbery that a second man was involved. In addition, he focused on appellant instead of Sanders in the investigation because he was investigating appellant in two prior incidents, which he suspected appellant of being involved in, partly because the two

---

[12] ... Sanders apparently told Detective Feagins that he had been working.

10

locations were located close to appellant's apartment and were easily accessible to appellant's apartment through a hole in the fence. Additionally, the manager of the apartment complex gave Detective Feagins information that led him to believe that appellant, not Sanders, was the suspect in the Sonic robbery. He believed appellant walked, rather than drove, during the prior incidents. Finally, appellant's and Sanders's descriptions of appellant's borrowing the gold Suburban corresponded. Detective Feagins did not think Sanders would have had time to commit the robbery on his own, switch cars with appellant, and then appellant be in the wreck "minutes later."[13]

Detective Feagins confirmed that Carlton and Sharice did not say that they ever saw a gun in appellant's hand.

Several witnesses testified to appellant's involvement in the Sonic robbery; he does not challenge the legal and factual sufficiency of that evidence on appeal.

---

[13] Sanders's place of employment was about three miles from where the wreck occurred and about eight or nine miles from the Sonic.

Analysis

Appellant contends that the evidence is insufficient to show that he abducted either Carlton or Sharice by restraining them with the intent to prevent their liberation by threatening to use deadly force. With regard to Sharice, appellant contends the evidence shows that she was only acting at Carlton's direction and that he never pointed whatever was under the towel at her. As to Carlton, he claims that there was no threat of deadly force because Carlton did not know what was under the towel. Appellant contends that Carlton and Sharice were, at most, "temporarily inconvenienced" by his actions.

Applicable Law

To prove aggravated kidnapping as alleged here, the State had to show that appellant intentionally or knowingly abducted Carlton and Sharice with the intent to facilitate his flight from the robbery. Tex. Penal Code Ann. § 20.04(a)(3) (Vernon 2003); *Franks v. State*, 90 S.W.3d 771, 792 (Tex. App.—Fort Worth 2002, pet. ref'd, untimely filed). "Abduct" as alleged in this case means to restrain a person with the intent to prevent liberation by threatening deadly force. Tex. Penal Code Ann. § 20.01(2)(B) (Vernon Supp. 2009). "Restrain" means to restrict a person's movement without consent so as to interfere substantially with his or her liberty by moving him or her from one place to another. *Id*. § 20.01(1). Restraint by force or intimidation is

12

"without consent." *Id.* § 20.01(1)(A). "Deadly force" is either force intended or known by the actor to cause death or serious bodily injury or force capable of causing death or serious bodily injury in the manner of its use or intended use. *See Ferrel v. State*, 55 S.W.3d 586, 591–92 (Tex. Crim. App. 2001); *Kenny v. State*, 292 S.W.3d 89, 98 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). Threats may be communicated by actions, words, or deeds, including "acts amounting to an offer to use future force." *See Rogers v. State*, 550 S.W.2d 78, 81 (Tex. Crim. App. 1977).

Legal Sufficiency

We conclude and hold that the evidence is legally sufficient to support appellant's conviction of aggravated kidnapping of both Sharice and Carlton. The jury could have reasonably inferred that appellant had used the BB gun found in his apartment during the Sonic robbery, that he still had the BB gun with him after the wreck, and that he put a towel over it, using it to intimidate Carlton and Sharice by threatening to use deadly force. Carlton testified that he thought appellant had a gun, and there was testimony that a BB gun can be a deadly weapon, depending on proximity and location when it is fired. *See Adame v. State*, 69 S.W.3d 581, 581–82 (Tex. Crim. App. 2002); *In re R.D.*, No. 08-07-00100-CV, 2009 WL 638260, at *3 (Tex. App.—El Paso Mar. 12, 2009, pet. filed). Carlton testified that appellant did

13

not ask, but rather told, him to "Go" and "Get in the car," all the while pointing something at him that looked like a concealed gun. That appellant did not point whatever object he was concealing at Sharice is not relevant; his pointing the item at Carlton was an attempt to influence Sharice's actions by threatening deadly force against Carlton because they were traveling together. *See Jenkins v. State*, 248 S.W.3d 291, 293–94 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). Accordingly, based on the appropriate standard of review, we hold that the evidence is legally sufficient to sustain the verdict as to both counts. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

Factual Sufficiency

For the same reasons, we conclude and hold that, even considered in a neutral light, the evidence is not so weak that the jury's determination is clearly wrong and manifestly unjust. *See Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414–15, 417 (Tex. Crim. App. 2006). Based on the testimony of Carlton and Sharice, the physical evidence recovered by the police, and the testimony linking appellant to the Sonic robbery, the jury's verdict was based on permissible, reasonable inferences. We overrule appellant's eighth point.

14

Culpable Mental State

In his fifth through seventh points, appellant challenges the trial court's failure to instruct the jury on the culpable mental state for the offense and the proper definition of "abduct." He thus contends that the entire charge was defective because it allowed the jury to convict on less than the required statutory elements.

Standard of Review

When the application paragraph correctly instructs the jury but the abstract paragraph is erroneous, any error contained in the abstract instruction is not egregious. *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000); *Fulcher v. State*, 274 S.W.3d 713, 717 (Tex. App.—San Antonio 2008, pet. ref'd). However, when, as in this case, the jury charge contains all the required mens rea in the abstract and definition paragraphs, but fails to include an explicit mens rea in the application paragraph, we must consider whether jury charge error caused egregious harm because "the crucial part of the charge in determining the existence of fundamental error is that part where the law is applied to the facts." *Fulcher*, 274 S.W.3d at 717; *Hanks v. State*, 625 S.W.2d 433, 435 (Tex. App.—Houston [14th Dist.] 1981, no pet.).

Egregious harm is the type and level of harm that affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Allen v. State*, 253 S.W.3d 260, 264 & n.15 (Tex. Crim. App. 2008); *Olivas v. State,* 202 S.W.3d 137, 144, 149 (Tex. Crim. App. 2006); *Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1985) (op. on reh'g). In making an egregious harm determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171; *see generally Hutch v. State*, 922 S.W.2d 166, 172–74 (Tex. Crim. App. 1996). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174. Egregious harm is a difficult standard to prove and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *Hutch*, 922 S.W.2d at 171.

Analysis

Although the abstract part of the charge contained the culpable mental state and definitions of intentional and knowing, the culpable mental state was omitted in the application paragraph, which read:

16

Now, if you find from the evidence beyond a reasonable doubt that on or about the 22nd day of February, 2006, in Denton County, Texas, the defendant, JOHN YOUNG, did then and there with intent to facilitate his flight after the attempt or commission of a felony, to-wit: Robbery, abduct Sharice Brodie by restricting the movements of Sharice Brodie without her consent so as to interfere substantially with her liberty, by moving her from one place to another by threatening to use deadly force, then you will find the defendant guilty of Aggravated Kidnapping as alleged in Count II of the indictment.[14]

But the application paragraph immediately followed the abstract paragraph that included the culpable mental state, along with the correct definitions. Thus, viewing the charge as a whole, the abstract portion sufficiently informed the jury of the mental state required for commission of the charged offense. *See Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App.), *cert. denied*, 516 U.S. 832 (1995); *Fulcher*, 274 S.W.3d at 718; *Lane v. State*, 957 S.W.2d 584, 587 (Tex. App.—Dallas 1997, pet. ref'd).

Additionally, the majority of the testimony at trial, and the jury argument, focused on whether appellant was the person who committed the robbery and was driving the Suburban, an issue not contested on appeal; appellant's main defensive theory was that the owner of the Suburban could have been the perpetrator. In addressing the proof of abduction, the State argued that appellant shoved the gun under the towel and said, "Get in the car, Go," while

---

[14] The charge was the same as to the allegation involving Carlton.

17

approaching Carlton and that those actions amounted to a threat of force. Appellant argued to the jury that there was no evidence he was holding a gun, only that Carlton and Sharice perceived he was doing so; therefore, he could not have threatened deadly force. None of the evidence pointed to a different mental state regarding the alleged restraint of Carlton's and Sharice's liberty, especially considering the State's emphasis that appellant's actions toward them were made with the specific *intent* to facilitate his flight from the robbery. Accordingly, we conclude and hold that appellant did not suffer egregious harm as a result of this error in the application paragraph of the charge.

Appellant also complains, without citation to authority, that the trial court erroneously substituted "liberty" for "liberation" in the definition of "abduct" in the application paragraph, causing egregious harm. However, the court correctly defined "abduct" in the abstract part of the charge, which read: "'Abduct' means to restrain a person with intent to prevent his or her *liberation* by using or threatening to use deadly force." [Emphasis added.] *See* Tex. Penal Code Ann. § 20.01(2)(B); *Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009). Additionally, although appellant contends that this switch of words "lowered the burden of proof because many things could interfere generally with one[']s liberty but not with one[']s liberation," the usage here implies essentially the same thing: "liberty" is defined as freedom from

18

physical restraint, and "liberation" is defined as the act of setting free or the state of being set free.  Merriam Webster's Collegiate Dictionary 670 (10th ed. 1996).  Accordingly, we conclude and hold that appellant did not suffer egregious harm from this minor error in the definition of abduct in the application part of the charge.  We overrule appellant's fifth through seventh points.

Lesser-Included Offense

In his ninth point, appellant contends that the trial court erred by failing to include an instruction on unlawful restraint in the charge.  At the charge conference, both attorneys stated that they had read the charge and had no objections.  The trial court need not submit a lesser included instruction sua sponte if neither side requests one.  *Delgado v. State*, 235 S.W.3d 244, 249–50 (Tex. Crim. App. 2007); *Mashburn v. State*, 272 S.W.3d 1, 15 (Tex. App.—Fort Worth 2008, pet. ref'd).  Moreover, the defense may not claim error successfully on appeal due to the omission of a lesser included offense if the defense did not request one.  *Delgado*, 235 S.W.3d at 250; *Mashburn*, 272 S.W.3d at 15.  Accordingly, we overrule appellant's ninth point.

## Safe Release Instruction

In his first and second points, appellant contends that the charge at punishment should have included an instruction on safe release and that trial counsel was ineffective for failing to request such an instruction.

Aggravated kidnapping is a first degree felony unless a defendant proves at punishment that he or she voluntarily released the victim in a safe place, in which case it is a second degree felony. *See* Tex. Penal Code Ann. § 20.04(c)–(d). Because appellant did not request such an instruction, the trial court did not err by failing to include one sua sponte. *See id.*; *Posey v. State*, 966 S.W.2d 57, 63 (Tex. Crim. App. 1998); *Hernandez v. State*, 10 S.W.3d 812, 821 (Tex. App.—Beaumont 2000, pet. ref'd). We overrule appellant's first point.

Appellant also claims that his counsel was ineffective for failing to request a safe release instruction. However, appellant cannot show that but for this failure, the outcome would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). Here, the jury found both of the enhancement paragraphs true. Because the enhanced punishment range is the same for a second degree felony enhanced by two prior felony convictions as it is for a first degree felony enhanced by two prior felony

convictions, appellant would have been subject to the same punishment range even if his counsel had requested a safe release instruction and proved the defense to the jury by a preponderance of the evidence. *See* Tex. Penal Code Ann. § 12.42(d) (Vernon Supp. 2009); *Milner v. State*, 263 S.W.3d 146, 148 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We overrule appellant's second point.

Order of Enhancement Offenses

In his third and fourth points, appellant contends that the trial court erred by failing to instruct the jury that it must find that the second alleged enhancement offense was committed after the first alleged enhancement offense and that the trial court erred by improperly commenting on the evidence in the jury charge as a result of erroneously instructing the jury to find the second alleged enhancement paragraph true without first finding that it was committed after the first alleged enhancement offense became final.

For a conviction to be enhanced under penal code section 12.42(d), "[t]he [chronological] sequence of events must be proved as follows: (1) the first conviction becomes final; (2) the offense leading to a later conviction is committed; (3) the later conviction becomes final; (4) the offense for which defendant presently stands accused is committed." Tex. Penal Code Ann. § 12.42(d); *Jordan v. State*, 256 S.W.3d 286, 290–91 (Tex. Crim. App.

21

2008) (quoting *Tomlin v. State*, 722 S.W.2d 702, 705 (Tex. Crim. App. 1987)).

The charge at punishment instructed the jury as follows:

If you find from the evidence beyond a reasonable doubt, that prior to the commission of the offense of which you have just found the defendant guilty, that the defendant was convicted in cause number 406751D on or about the 13th day of June, 1991, in the Criminal District Court of Tarrant County, Texas, for the felony offense of Forgery, and that such conviction, if any, occurred and the judgment thereon became final prior to the commission of the offense for which you have found the defendant guilty, you will find that the allegation in the first enhancement paragraph is "true." If you do not so believe, or if you have a reasonable doubt thereof, you will so state by signing the appropriate verdict form under the instructions herein given to you.

If you find from the evidence beyond a reasonable doubt, that prior to the commission of the offense of which you have just found the defendant guilty, that the defendant was convicted in cause number F-9345014-UJ on or about the 10th day of December, 1993, in the Criminal District Court of Dallas County, Texas, for the felony offense of Aggravated Robbery, and that such conviction, if any, occurred and the judgment thereon became final prior to the commission of the offense for which you have found the defendant guilty, you will find that the allegation in the second enhancement paragraph is "true." If you do not so believe, or if you have a reasonable doubt thereof, you will so state by signing the appropriate verdict form under the instructions herein given you.

In the event you have found that both the first enhancement paragraph and the second enhancement paragraph is true beyond a reasonable doubt, you will assess the punishment of the defendant at confinement in the Institutional Division of the Texas Department of Criminal Justice for any term of years not less than

twenty-five (25) years nor more than ninety-nine (99) years, or life. . . .

The part of the verdict form signed by the jury foreperson read as follows:

> We, the jury, having found the defendant, JOHN YOUNG, guilty of the offense of Aggravated Kidnapping, as alleged in Count I of the indictment, further find that the allegations contained in both enhancement paragraphs of the indictment herein as "True", and that the defendant is the same person who, prior to the commission of said offense of Aggravated Kidnapping, Count I, had been convicted of the offense of Forgery in cause number 406751D in Tarrant County, Texas on the 13th day of June, 1991, and we further find that prior to the commission of that offense of Forgery the defendant had been convicted of the felony offense of Aggravated Robbery in cause number F-9345014-UJ in Dallas County, Texas on the 10th day of December, 1993, and we assess his punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of 55 YEARS. (Insert a term of not less than twenty-five (25) years nor more than ninety-nine (99) years, OR insert the word "Life") . . . .

The State concedes that the charge erroneously instructed the jury to assess punishment in the range of twenty-five to ninety-nine years or life if it found the 1993 Dallas County conviction occurred "prior to" instead of after the 1991 Tarrant County conviction.  Because appellant stated affirmatively that he had no objection to the charge, we review harm under the *Almanza* egregious harm standard.  *See* Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007); *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); *Almanza*, 686 S.W.2d at 171–72; *cf. Jordan*, 256 S.W.3d at 292 (refusing to apply harm analysis when State did not sufficiently prove enhancement allegations because

23

"rather than ensuing from action or inaction on the part of the trial judge, [evidentiary insufficiency] resulted from the jury's unsupported determination that the State's evidence supported a finding of true to the second enhancement allegation").

The State introduced pen packets for the 1991 and 1993 offenses, showing that appellant was sentenced in Tarrant County on June 13, 1991, that he committed the Dallas County offense on October 12, 1993, and that he was sentenced in the Dallas County offense on December 10, 1993. Appellant did not challenge the finality of the offenses; instead, he argued that the State did not sufficiently prove that the fingerprints on the pen packets were his fingerprints. *See Fletcher v. State*, 214 S.W.3d 5, 8 (Tex. Crim. App. 2007) ("Once the State provides prima facie evidence of an enhancement conviction, 'this Court will presume that a conviction is final when faced with a silent record regarding such.'"). Accordingly, the evidence presented by the State sufficiently proved the statutorily-prescribed order of the enhancement offenses. And, although we do not presume to divine the processes of the jury's deliberations, the error in the charge seems to be obvious, as a 1991 conviction would have clearly occurred *before* a 1993 conviction. Accordingly, we conclude and hold that appellant was not egregiously harmed by the error.

24

*See Rice v. State*, 746 S.W.2d 356, 360–61 (Tex. App.—Fort Worth 1988, pet. ref'd).  We overrule his third and fourth points.

## Conclusion

Having overruled all of appellant's points, we affirm the trial court's judgment.


TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
*See* Tex. R. App. P. 47.2

DELIVERED:  December 17, 2009

25