Opinion
issued November 30, 2010

 

 



 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

­­­­­­­­­­



 

NO. 01-07-00889-CR

 



 

THURSTON T.
MITCHELL, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from
the 185th District Court

Harris County,
Texas

Trial Court Cause No.  1113267

 

 



MEMORANDUM
OPINION

          Appellant, Thurston Mitchell, was convicted
by a jury of the third-degree felony offense of assault on a peace officer[1]
and, finding the felony enhancement paragraph as true, the jury assessed Mitchell’s
punishment at two years confinement.[2]
 By eight points of error, we are asked
to determine the legal and factual sufficiency of the evidence and whether Mitchell
was deprived of his right to effective assistance of counsel because:

(1)     trial counsel failed to request jury
instructions on the defenses of self-defense, and defense of a third person, as
well as on lesser-included offenses;

 

(2)     trial counsel failed to object to certain
statements and request a corresponding limiting jury instruction; and 

 

(3)     Mitchell was denied counsel during the
period of time to file a motion for new trial.  

 

          We affirm.

Facts

 

          When members of the Spring Volunteer
Fire Department were dispatched to a house fire in a residential area, Donnie
Guedry,[3]
the district chief for that sector, was approached by a highly agitated man
concerned that his house was going to burn down.  Guedry told the man, appellant Mitchell, who
lived next door to the burning home, that he needed to return to his own front
yard or Guedry would call the police. 
Mitchell directed a racial epithet at Guedry and accused Guedry of not
caring because Mitchell was black. 
Guedry responded that he did “not have time for that,” and repeated his
directive to leave the yard or be arrested. 
In Guedry’s opinion, Mitchell was interfering with the scene and was in
a zone that needed to be cleared for the safety of the firefighters and nearby
citizens.  Mitchell did not move until
the first fire truck pulled up and he then tried to pull a hose off of it.  When Guedry ordered Mitchell not to touch
anything on the truck or be arrested, Mitchell walked off, screaming and
swearing, and throwing his hands up in the air. 


          Guedry thereafter did call for police
to control the crowd and because Mitchell was still being loud and walking
between the trucks. Guedry wanted everyone but firefighters removed from the
area and a safe perimeter created.  In
addition to firefighters and police officers, there were approximately 20 to 25
people on the scene, located across the street from the house that was burning.
Guedry assigned a crew with a hose to protect Mitchell’s house and to ensure Mitchell
did not come back to Guedry.  Although
the fire was controlled and did not spread to any other house, the heat did
cause three or four pieces of Mitchell’s siding to melt. 

Deputy
Christopher Lawrence with the Harris County Precinct 4 Constable’s Office
arrived at the fire scene with Corporal Steve Romero in response to the fire
department’s request for assistance and to secure the scene.  The fire had just been put out[4]
upon their arrival and Deputy Terrence Richardson advised them of the fire
chief’s request for a safety perimeter in order to finish working on the
fire.  Patrol cars were parked to form
the security perimeter and civilians were not to pass in front of them.  Residents who lived within the safety
perimeter were allowed home if they lived on the West side of the street, but
residents from the East side of the street, where the fire department was
working, were to wait on the West side until the fire department was finished. 

Lawrence
and Deputy Constable Randall Adams were assigned to the northern end of Briar
Creek. A woman, later identified as Mitchell’s wife, attempted to breach the
safety perimeter and the officers on point explained to her that she could not
be allowed pass the perimeter.  Asked for
her identification showing her address, she refused and became extremely irate
stating:  She needed no “[expletive] ID,”
it was her “[expletive] house,” and she would “go down there if [she]
[expletive] wanted to.” Adams called a supervisor at her request.  

Mr.
Mitchell came running up from behind the officers,[5]
took hold of Mrs. Mitchell, and told the officers that she was his “[expletive]
wife,” that “y’all [expletives] have to let her pass,” that “that is our
[expletive] house,” and that the officers could not stop them from going to
their own house.  Lawrence told him that
if he had identification, he would be allowed to pass.  Adams tried to explain the situation to Mrs.
Mitchell, while Mr. Mitchell was running back and forth on the “fire line,”
yelling, screaming, and cursing.  Adams
attempted to explain to both Mitchells the officers’ duty to keep them from
going toward the burning house and that they could not let them pass for their
own safety.  

Mr.
Mitchell then repeatedly attempted to walk around the officers but Lawrence
stepped in front of him each time and blocked him.  A neighbor eventually confirmed that the
Mitchells lived on the street, and Lawrence then permitted Mr. Mitchell to pass
but directed him to remain on the West side of the road.  Mr. Mitchell did so.  When Lawrence advised Adams to allow Mrs.
Mitchell through, she began yelling “what you say, what you say”
repeatedly.   It was explained to her
that she could cross the perimeter, but was to remain on the West side of the
street and was not permitted to go to her house, as it was next door to the
fire.  All non-emergency personnel were
on the West side of the street.    

Mrs.
Mitchell did not move. Lawrence testified that Mr. Mitchell then returned and
attempted to “get in” Lawrence’s face and “chest-butted” him, telling Lawrence
that he could “not talk to [Mitchell’s] [expletive] wife that way.”  Lawrence pushed Mr. Mitchell back[6]
and told him to step away.  Mr. Mitchell
and Lawrence had been within inches of each other. Adams, who had been two to
three feet away speaking to Mrs. Mitchell, testified that Mr. Mitchell, a few
seconds thereafter, pushed Lawrence, stepped back and clenched both his fists
as if he were going to strike someone. 
Adams then grabbed Mr. Mitchell’s right arm at the wrist, and Lawrence
unsuccessfully tried to grab Mitchell’s left arm but Mitchell swung and struck
Adams’ right eye. Adams then “bear-hugged” Mitchell to prevent further blows
while Lawrence secured Mitchell’s left arm, and Deputy Richardson pushed
everyone to the ground. 

Meanwhile,
Mrs. Mitchell was yelling profanities, screaming about police brutality, taking
pictures with her camera phone, and promising that she was going to call
Quanell X. In her complaint to Corporal Romero, the supervisor, she referred to
Lawrence in profane terms, saying that he had been rude and aggressive toward
Mr. Mitchell. Mrs. Mitchell also cursed at Guedry, telling him to move his
“[expletive] truck.” 

Lawrence
and Adams transported Mitchell to the police station in the back of Adams’s
patrol car.  The officers testified that
they asked him no questions en route but that Mr. Mitchell repeatedly noted his
regret that he had hit Adams and that he had meant to hit the other
[expletive], all the while looking and nodding toward Lawrence.  At the station, both Mitchell and Adams were
examined by emergency medical staff[7]
but, absent any signs of injury, no medical care was necessary for Mitchell.[8]
Adams’s right eye “stung a bit” and was painful, red, and swollen that night,
but the paramedics found no concussion and applied an ice pack to his face to
reduce the swelling.  The area under the
right eye was bruised and sore the next morning.  Adams also received a cut on his left hand.[9]

In addition
to Lawrence, Adams and the Mitchells, other witnesses were deputy fire chief
Guedry, and deputy constables Richardson, Guajardo, and Romero, all of whom
testified they saw Mitchell arguing with Lawrence, shoving Lawrence, swinging
his arm, Adams trying to grab Mitchell’s arm, and Mitchell and the officers
going down.  Richardson’s and Guajardo’s
testimony was that they witnessed Mitchell strike Adams. Guedry, although one
to one and a quarter lots away (estimated at 45 feet) from the fray, was able
to see them because the fire trucks’ many bright lights illuminated the scene
“almost like daylight.”  Although 20 to
25 feet away when he first heard the yelling, Richardson started walking
towards them.  Romero, too, some 20–30
feet away, started toward Lawrence and Mitchell when he noticed something
afoot.  Guajardo was alerted by a
firefighter.

          Mitchell’s subsequent indictment for
assault on a peace officer alleged that he had caused bodily injury to Adams, 

“a person [Mitchell] knew
was a public servant[,] while [Adams] was lawfully discharging an official
duty, to wit: TRYING TO KEEP [Mitchell] FROM APPROACHING A BURNING BUILDING by
STRIKING [Adams] WITH HIS HAND.” 

 

(Capitalization in
original).  

 

At trial,
Mitchell’s defense was that he had never hit Adams.  Mitchell told the jury, “I’m innocent.  I am not guilty. I didn’t hit that man.  I am not guilty. Didn’t hit him.”

Mitchell’s Testimony

Mr.
Mitchell’s testimony was that, after the fire began, his wife took the children
down the street to her father’s home, and he awaited her return in his
neighbor’s driveway two houses north of his, where his work van was parked.  When at the scene of the fire and Deputy
Constable Lawrence asked him to identify his wife, he had done so without
moving from that position.  Lawrence had
then asked him to come to where the officers were to confirm that she was his
wife, and he complied.  Lawrence had then
asked for identification to prove that she was his wife and Mr. Mitchell had
told the officer that he had none as they lived next to the house that had
caught on fire.  When Mr. Mitchell had
then reached out to take hold of his wife’s hand, Lawrence pushed him.  Mrs. Mitchell then called 911. Eventually,
after walking about five houses down and encountering a neighbor who was able
to identify Mr. Mitchell as living in the perimeter, Lawrence confirmed the
Mitchells’ residence, and Mr. Mitchell crossed the street to get his wife. 

According
to Mr. Mitchell, Lawrence became angry after the Mitchells’ residence was
confirmed and had used profanity in his directives to Mr. Mitchell and to
officer Adams to allow Mrs. Mitchell to clear the perimeter.

Mr.
Mitchell had then urged his wife, “Let’s go,” but before doing so, they asked
the officers for their badge numbers. 
Lawrence then yelled at Mrs. Mitchell, and lunged at her.  Mr. Mitchell response was to tell Lawrence
that he was acting unprofessionally.  The
Mitchells had interlocked their arms while Lawrence was yelling at them to go
to their house.  Just as Mr. Mitchell was
trying to bring his wife through to the side he was on and to pass by, Lawrence
pushed him. Mr. Mitchell had then asked Lawrence why he had put his hands on
him, and had told Lawrence that he was going to file charges on him.  Lawrence had then violently pushed him, Mr.
Mitchell fell back, and Adams “jumped” him from behind.  Lawrence had tried to hit him and Mitchell
ducked and they all fell to the ground, with Mr. Mitchell on top of
Lawrence.  Mr. Mitchell explained that
his left hand had gotten stuck in his pocket because the pocket was small and
his hand was wrapped around a cell phone, not that he placed his hands inside
his pockets to avoid getting arrested. 
Mr. Mitchell described himself as being able to “do nothing” while on
top of Lawrence because Adams was on his back and he was “sitting [t]here”
wondering what the police were doing when Lawrence started to choke him and
Richardson started telling other officers to get Mr. Mitchell’s hand out of his
pocket.  After wresting Mr. Mitchell’s
hands from his pockets, Richardson handcuffed him and placed him in the back of
the patrol unit.  Adams then came over
and said something unpleasant to him, and Mitchell called his wife on his cell
phone.  The officers then came and took
Mr. Mitchell’s cell phone away.  Mr.
Mitchell denied having had any conversation with the officers while being
transported and denied having apologized to Adams. 

Mr. Mitchell
testified that he had not struck Adams or any of the other officers and had not
resisted arrest.  When asked about
Adams’s black eye, Mr. Mitchell stated that he had not seen a black eye on
Adams on the way to the station.  Mr.
Mitchell denied being hostile with the firefighters that night, using profanity
toward Lawrence, being rude to an officer, or hitting an officer.   

Mrs.
Mitchell likewise testified that Lawrence had lunged at her and sworn at her; Mitchell
had stepped in front of her and been pushed by Lawrence twice, causing Mr.
Mitchell to fall down; and Adams had then grabbed Mr. Mitchell by the neck and
all three fell to the ground.  Adams had
been on Mr. Mitchell’s back, other officers had then come over, and one had
yelled to get Mr. Mitchell’s hand.  Five
officers had assisted in the assault on her husband, ending up on top of him. 

According
to Mrs. Mitchell, Lawrence had pushed Mr. Mitchell earlier that evening when
Mr. Mitchell was inside the perimeter and Lawrence had asked Mr. Mitchells for
identification.  After the three went
down, she called 911 because Lawrence had assaulted her husband twice and she
asked for a sergeant to be sent out. 
Mrs. Mitchell stated that Mr. Mitchell never touched Lawrence or Adams
and had not yelled or cursed unless he was yelled at by the officers. Mrs.
Mitchell testified that she had yelled and cursed at the scene.  

Mr.
Mitchell’s minor son also testified at trial, but only about the start of the
fire.  He was not present at the time of
the confrontation.

The jury
found Mr. Mitchell guilty of aggravated assault on a peace officer and assessed
punishment at two years in prison.  No
motion for new trial was filed. 

Sufficiency Challenges

 

In his
seventh and eight points of error, Mitchell contends that the evidence at trial
did not establish that Adams was lawfully discharging an official duty at the
time of the assault.  Mitchell argues
that there was conflicting evidence about whether, at the time of the incident,
the building was still burning and
whether Mitchell was attempting to approach
the building at the time of the incident, and asserts that these conflicts make
the evidence factually and legally insufficient to support his conviction.  In support of his argument, Mitchell relies
on cases citing the well-established legal and factual sufficiency standards as
set forth in Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781,
2789 (1979) and Watson v. State, 204
S.W.3d 404, 414–15 (Tex. Crim. App. 2006).

A.      Discussion

          The elements for assault on
a public servant are (1) a person (2) intentionally, knowingly, or recklessly
(3) causes bodily injury (4) to a person the actor knows is a public servant
(5) while the public servant is lawfully discharging an official duty, or in retaliation
or on account of an exercise of official power or performance of an official
duty as a public servant.  Tex. Penal Code Ann. § 22.01(a)(1),
(b)(1) (Vernon Supp. 2010).  

          Mitchell challenges the legal
and factual sufficiency of the evidence to prove that Adams was lawfully
discharging an official duty at the time of this assault because the State
failed to prove that Adams was “trying to keep [Mitchell] from approaching a
burning building.”  Mitchell argues that
there was conflicting evidence at trial as to whether the building was still
burning and whether Mitchell was trying to approach the building. Mitchell
suggests that the State failed to prove, beyond a reasonable doubt, the portion
of the indictment and charge that reads, “trying to keep [Mitchell] from
approaching a burning building.” 

Mitchell’s
arguments implicate the state law sufficiency standard as set forth under Malik v. State. 953 S.W.2d 234, 239–40
(Tex. Crim. App. 1997).     Under state law, in determining both the legal
and the factual sufficiency of the evidence, we measure the evidentiary
sufficiency by the elements of the offense as defined by the hypothetically
correct jury charge for the case.  See
Vega v. State, 267 S.W.3d 912, 915 (Tex. Crim. App. 2008) (citing Wooley
v. State, 273 S.W.3d 260, 268 (Tex. Crim. App. 2008)) (factual sufficiency);
Malik, 953 S.W.2d at 239–40 (legal sufficiency).   Under
this standard, where there is a contention that the evidence is insufficient
because of a variance between the indictment and proof, “[a]llegations giving
rise to immaterial variances may be disregarded in the hypothetically correct
jury charge, but allegations giving rise to material variances must be
included.” Gollihar v. State, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001).
 A variance is fatal only when it is
material and prejudices a defendant’s substantive rights.  Id.

In his
brief, Mitchell does not cite to any authorities setting out the state law
evidentiary sufficiency standard, nor does he discuss such standard or how the
evidence proffered at trial should be reviewed under that standard.  

1.       The
application of Malik to Jackson v. Virginia evidentiary claims

          “Malik’s evidentiary
sufficiency standard [is] a purely state law standard that is ‘foreign to
federal constitutional norms’ . . . [and so] does not apply to [federal
constitutional] evidentiary sufficiency claims.” See Fuller v. State, 73
S.W.3d 250, 252 (Tex. Crim. App. 2002).  Thus, where a defendant contends that the
evidence is insufficient under the federal constitutional sufficiency standard
of Jackson, we review his legal
sufficiency claims under that standard, not the state evidentiary standard of Malik. 
Id. (noting that Malik standard of sufficiency is
“clearly not the same” as Jackson v.
Virginia standard, and thus not applicable to Jackson v. Virginia sufficiency claim).  

Under the
federal constitutional standard of Jackson,
the issue before us is whether the phrase “trying to keep [Mitchell] from
approaching a burning building,” is a substantive element of the assault on a
peace officer as defined by state law.  See id. at 252–53.  If not, then, under the Jackson v. Virginia standard, the failure of the State to prove
such a phrase would not make the evidence legally insufficient.  See id.
at 253.  An “element of the offense” is
defined, in relevant part, as the forbidden conduct with the required
culpability.  See Tex. Penal Code Ann.
§§ 1.07(a)(22)(A),(B) (Vernon Supp. 2010); Fuller,
73 S.W.3d at 252–53.  Section 22.01(b)(1)
of the Penal Code further defines assault on a public servant as assault on a person
the actor knows to be a public servant while the public servant is lawfully
discharging an official duty, or in retaliation or on account of an exercise of
official power or performance of an official duty as a public servant. Tex. Penal Code Ann. § 22.01(b)(1).  It does not define the specific description
of the official duty, in this case “trying to keep [Mitchell] from approaching
a burning building” as a substantive element of the offense.  See
Fuller, 73 S.W.3d at 253 (holding that victim’s name was not substantive
element of offense of injury to an elderly individual, noting that state law
did not define the offense as “injury to an elderly individual named [victim’s
name in case].”).  Under federal
constitutional standards, even if the State failed to specifically prove that Adams
was trying to keep Mitchell from approaching
a burning building, such failure would
not make the evidence insufficient to support Mitchell’s conviction under federal
constitutional standards.  See id.  


2.       Sufficiency
under state evidentiary standards

Under the
state evidentiary standard, both legal and factual sufficiency claims are measured
by the elements of the offense as defined by the hypothetically correct jury
charge for the case.  See Vega,
267 S.W.3d at 915; Malik, 953 S.W.2d
at 239–40.  A hypothetically correct jury
charge “sets out the law, is authorized by the indictment, does not
unnecessarily increase the State’s burden of proof or unnecessarily restrict
the State’s theories of liability, and adequately describes the particular
offense for which the defendant was tried.” 
Malik, 953 S.W.2d at 240. 
This standard ensures that a judgment of acquittal, or a reversal for a
new trial in the case of factual insufficiency, is “reserved for those
situations in which there is an actual failure in the State’s proof of the
crime rather than a mere error in the jury charge submitted.”  See id.; Wooley, 273 S.W.3d at
267–68 (holding that remedy of new trial “sweeps too broadly” and is
“inappropriate remedy” to be granted because defendant received windfall in
jury instruction).  

Applying
such standard to the present case, a hypothetically correct jury charge for a
felony offense of assault would not include the phrase “TRYING TO KEEP [Mitchell]
FROM APPROACHING A BURNING BUILDING” because that phrase is not a statutory
element of the offense charged or an “integral part of an essential element of
the offense.”  See Tex. Penal Code Ann. § 22.01(a)(1), (b)(1);
Gharbi v. State, 131 S.W.3d 481, 482–83 (Tex. Crim. App. 2003) (holding
that when challenged allegation was not a statutory element or an “integral
part of an essential element” of charged offense, it need not be included in
hypothetically correct jury charge); Fuller,
73 S.W.3d at 254 (holding that victim’s name did not have to be included in
hypothetically correct jury charge).  Thus,
the State was not required to prove the phrase “TRYING TO KEEP [Mitchell] FROM
APPROACHING A BURNING BUILDING” beyond a reasonable doubt in order for the
evidence to be legally or factually sufficient to support Mitchell’s
convictions under the state evidentiary sufficiency standard.  See Gharbi, 131 S.W.3d at 483; Fuller,
73 S.W.3d at 254; Gollihar, 46 S.W.3d at 255–57. 

Moreover,
the variance between the indictment and the proof at trial was not
material.  See Gollihar, 46 S.W.3d at 257 (holding that material variance is
one that (1) fails to inform defendant of charge against him sufficiently to
allow him to prepare an adequate defense at trial or (2) does not describe
offense clearly enough to protect defendant from being subjected to risk of
later prosecution for same crime). The record here is devoid of any suggestion
that Mitchell was not informed of the offense with which he was charged or that
his ability to prepare an adequate defense was impaired.  Mitchell’s defense was that he did not hit
the officer. This defense was not affected by whether the Mitchell was
approaching or moving away from a building or whether it was burning or merely
smoldering. Variance on those details between the indictment and the proof at
trial poses no hindrance to preparation of an adequate defense.  See
Flenteroy v. State, 187 S.W.3d 406, 411 (Tex. Crim. App. 2005) (holding
that when indictment alleged appellant used “screwdriver” in commission of
crime, and proof at trial was that “hard metal-like object” was used, variance
was immaterial because appellant’s defense [that he had not used a weapon] did
not depend on whether particular type of weapon was used; indictment
sufficiently informed him of charge against him to allow him to adequately
present defense).  Nor would any such
variance have subjected Mitchell to another prosecution for the same
offense.  Accordingly, any variance
between the evidence at trial and the phrase “TRYING TO KEEP [Mitchell] FROM
APPROACHING A BURNING BUILDING” as used in the indictment was immaterial and
would not render the evidence legally or factually insufficient to support Mitchell’s
conviction.  See Flenteroy, 187 S.W.3d at 411; Gharbi, 131 S.W.3d at 483;
Fuller, 73 S.W.3d at 252–56; Gollihar v. State, 46 S.W.3d at 255–57.


We overrule
Mitchell’s seventh and eight points of error. 

Ineffective Assistance of Counsel Challenges

 

          In issues one through six,[10]
Mitchell argues that his defense counsel rendered ineffective assistance by (1)
failing to request jury instructions on self-defense, defense of a third person,
and on lesser-included offenses of simple assault and resisting arrest, (2)
failing to object to certain testimony as hearsay and extraneous criminal
conduct under Rule of Evidence 404(b) and to request a limiting instruction
thereon, and (3) failing to file a motion for new trial. 

A.      Standard of review for contentions of ineffective assistance of
counsel

 

          The United States Constitution, the
Texas Constitution, and a Texas statute guarantee an accused the right to
reasonably effective assistance of counsel. 
See U.S. Const.
amend. VI; Tex. Const. art. I, §
10; Tex. Code Crim. Proc. Ann.
art. 1.051 (Vernon Supp. 2010); Strickland v. Washington, 466 U.S. 668,
686, 104 S. Ct. 2052, 2063 (1984); Ex parte Gonzales, 945 S.W.2d 830,
835 (Tex. Crim. App. 1997).  To prove
ineffective assistance of counsel, an appellant must show that (1) trial
counsel’s representation fell below an objective standard of reasonableness,
based on prevailing professional norms, and (2) there is a reasonable
probability that the result of the proceeding would have been different but for
trial counsel’s deficient performance.  See
Strickland, 466 U.S. at 687–95, 104 S. Ct. at 2064–69; Hernandez v. State,
726 S.W.2d 53, 55–57 (Tex. Crim. App. 1986) (applying Strickland test to
review of claim of ineffective assistance of counsel under Texas statutes and
constitutional provisions). Under Strickland, the appellant “must prove,
by a preponderance of the evidence, that there is, in fact, no plausible
professional reason for a specific act or omission.”   Bone v. State, 77 S.W.3d 828, 836
(Tex. Crim. App. 2002).  The appellant
must also show a reasonable probability that, but for counsel’s error, the
result of the proceeding would have been different.  Id. at 833.  

          Judicial scrutiny of counsel’s
performance must be highly deferential, and the defendant must overcome the
presumption that, under the circumstances of the case, the challenged action
might be considered sound trial strategy. Strickland, 466 U.S. at 689,
104 S. Ct. at 2065.  We apply a strong
presumption that trial counsel was competent and presume that counsel’s actions
and decisions were reasonably professional and motivated by sound trial
strategy.  Jackson v. State, 877
S.W.2d 768, 771 (Tex. Crim. App. 1994).          

B.      Contentions of ineffective assistance

 

          1.       Failure to request instructions on
self-defense, defense of a third-person and lesser-included offense of simple
assault and resisting arrest

 

Mitchell asserts that his counsel rendered ineffective
assistance by failing to request jury instructions on self-defense, defense of
a third person, and lesser-included offenses of misdemeanor assault and
resisting arrest.  However, as the record
affirmatively demonstrates, Mitchell was not entitled to these instructions and
trial counsel’s failure to request them was not ineffective.  


Self-defense and defense of a third person are
“justification” defenses and to be entitled to an instruction on either, a
defendant must admit to committing the conduct that, but for that
justification, would otherwise be considered a crime.  See Tex. Penal Code Ann. §9.31 (Vernon 2003) (self-defense), § 9.33 (defense of third person)
(Vernon Supp. 2010) (both providing that “a person is justified in using force”
“against another” under certain circumstances); see discussion in Ex Parte Nailor, 149 S.W.3d 125, 133 & n.33
(Tex. Crim. App. 2004) (discussing statutory legal defenses and holding that in
order to raise justification defense, defendant was required to admit
committing offense, then offer defense as justification);  Ford v.
State, 112 S.W.3d 788, 794 (Tex. App.—Houston [14th Dist.] 2003,  no pet.) (holding that self-defense is
inconsistent with denial of commission of offense; to raise self-defense,
defendant must admit committing offense and then offer self-defense as
justification; and holding that where defendant did not admit offense and then
offer self-defense as justification, he was not entitled to jury instruction on
self-defense).  Here, therefore, to be
entitled to a jury instruction on either self-defense or defense of a third
person, Mitchell would have had to admit to striking Adams, but with the legal
justification of self-defense or defense of a third person.  See Ex
Parte Nailor, 149 S.W.3d at 133; Ford,
112 S.W.3d at 794.  As Mitchell’s denial
of striking Adams was unequivocal, he was not entitled to either jury
instruction.  See Ex Parte Nailor, 149 S.W.3d at 133; Ford, 112 S.W.3d at 794.  

Similarly, in order to be
entitled to an instruction on a lesser-included offense (1) the lesser-included
offense must be included within the proof necessary to establish the offense
charged, and (2) some evidence must exist in the record that would permit a jury
rationally to find that the defendant is guilty only of the lesser-included
offense.  Lofton v. State, 45 S.W.3d 649, 651 (Tex. Crim. App. 2001).

The State asserts that
resisting arrest is not a lesser-included offense of assault on a public
servant under the facts of this case. We agree. See id. at 652 (holding that jury instruction on resisting arrest
was properly denied when evidence that defendant struck officer).  Therefore, Mitchell was not entitled to a
jury instruction on resisting arrest and trial counsel was not ineffective in
not requesting such a jury instruction.    

The State does not contend that misdemeanor assault is
not a lesser-included offense of assault on a public servant, so as to that
offense, we turn directly to considering the second requirement—whether there
is some evidence that would permit a jury rationally to find that Mitchell is
guilty only of misdemeanour assault.  See id. at 651.  Mitchell contends that his own testimony—that
Lawrence and Adams were not lawfully discharging an official duty at the time
of the alleged assault by Mitchell, but rather were unlawfully assaulting
him—was some evidence in the record that, if believed, showed that if Mitchell
was guilty, he was guilty only of misdemeanor assault for striking Adams while
Adams was not lawfully discharging an
official duty.  But Mitchell’s testimony,
if believed, does not raise evidence that he was guilty only of misdemeanor
assault. Rather, if believed, his testimony calls for an acquittal as he denied
striking Adams at all.[11]  

The court of criminal appeals has held that a
defendant’s own testimony that he committed no offense, or testimony which
otherwise shows that no offense occurred at all, is not adequate to raise the
issue of a lesser-included offense. Id. at
652.   In Lofton, as in the present case, the defendant was charged with
assault on a public servant for striking an officer in the face.  Id.
at 649, 651.  The defendant testified in
his own defense and denied touching any officers, stating that he had done nothing
wrong.  Id. at 651.  On appeal, the
defendant complained that the trial court erred in not submitting an
instruction to the jury on a lesser-included offense of resisting arrest.  Id.  The court of criminal appeals rejected this
argument, noting that the evidence must establish that, if the defendant was
guilty, he was guilty only of a lesser-included offense, and that a charge on a
lesser-included offense was not required when a defendant denied committing any
offense and there was no other evidence that, if guilty, he was guilty only of the lesser-included offense. Id. The court of criminal appeals
observed that, under the facts as presented in that case, resisting arrest was
not a rational alternative to assault on a public servant because if Mitchell’s
testimony was believed, there was no offense committed at all.  Id. at
652.

Similarly, if Mitchell’s (or his wife’s) testimony was
believed by the jury, the proper verdict would have been acquittal.  Mitchell’s testimony (and his wife’s) did
not, if believed, establish that he was guilty only of a lesser-included
offense.  In fact, both denied the
existence of necessary elements of either resisting arrest (preventing or
obstructing officer and using force against the officer) or misdemeanor assault
(causing bodily injury).  If believed, their
testimony established the existence of no offense at all.  Accordingly, the trial court would not have
been required to provide an instruction to the jury on either misdemeanor
assault or resisting arrest.  See id.; Martin v. State, 246 S.W.3d 246, 267 (Tex. App.—Houston [14th
Dist.] 2007, no pet.) (concluding that, in capital murder case, charge on
lesser-included offense of injury to a child was not required when defense was
that defendant committed no acts of violence against child).  As trial counsel’s failure to request jury
charges to which Mitchell was not entitled did not fall below
an objective standard of reasonableness, based on prevailing professional
norms, it does not meet the first prong
of Strickland.

          2.       Failure
to object to certain statements and evidence and to request a limiting
instruction

          

          Mitchell further complains
that his trial counsel was ineffective by not objecting to:

(1)     testimony
from Guedry that Mrs. Mitchell was screaming and cursing at the time of the
confrontation;

 

          (2)     testimony that Mrs. Mitchell had filed a
complaint against the

          deputies
alleging that the deputies had beat her husband or wrongfully taken him to
jail;

 

(3)     a
question by the State to one of the deputies, asking the witness if he was
aware of a complaint being filed by Mrs. Mitchell against him and other
deputies; and

 

          (4)     testimony from Lawrence and Adams that Mrs.
Mitchell was

                   using
profane language when attempting to get by them and to

                   her
house. 

 

          Mitchell argues that these
statements and question were inadmissible hearsay, evidence of extraneous
criminal conduct inadmissible under Rule 404(b), and irrelevant, or, if
relevant, their probative value was substantially outweighed by the danger of
unfair prejudice. Mitchell argues that the failure to object to this testimony
and question on those grounds, and to request a limiting instruction for
“extraneous conduct,” constitutes ineffective assistance of counsel.

          We first note that the
statements in question, in light of the record, were neither inadmissible
hearsay nor (apart from Mrs. Mitchell’s screaming and cursing) extraneous
conduct precluded under Rule 404(b). 
Neither the description of Mrs. Mitchell’s screams and curses nor her
allegations in her complaint against the deputies were hearsay as none were
offered for the truth of the matter asserted—which the deputies denied—but
rather simply to show her actions, allegations, and complaints against the
deputies.  See Tex. R. Evid. 801(d)
(defining hearsay as out-of-court statement “offered in evidence to prove the
truth of the matter asserted”).   The question posed to the deputy by the State was likewise not hearsay.  Id.  Similarly, the question asked and the testimony that a complaint was filed was not
“extraneous conduct” offered to prove
that Mitchell acted in conformity with such conduct on
the occasion of the assault, and therefore were not governed by the provisions
of Rule 404(b). See Tex. R. Evid. 404(b) (providing that
evidence of other crimes, wrongs or acts is “not admissible to prove the
character of a person in order to show action in conformity therewith.”)
(emphasis added). While Mrs. Mitchell’s cursing and yelling could be considered
extraneous conduct under Rule 404(b), see
Castlado v. State, 78 S.W.3d 345, 349 (Tex. Crim. App. 2002) (holding that
scope of 404(b) extended to acts by third party offered to prove defendant’s
propensity to act in conformity with acts of third party), here such evidence
was not offered to show that Mr. Mitchell acted in conformity with his wife’s
cursing and yelling, but to show the context of the crime.  See
Mann v. State, 718 S.W.2d 741, 744 (Tex. Crim. App. 1986) (holding that
extraneous offenses which are evidence of context of charged offense are almost
always admissible because offenses do not occur in a vacuum).  Such evidence was relevant here to describe
the scene and context of the alleged offense and its probative value was not
substantially outweighed by its prejudicial effect, particularly considering
the substantial evidence of Mr. Mitchell’s own yelling and use of profanities.  

          Similarly, the evidence of Mrs.
Mitchell’s complaints against the deputies was relevant, particularly to the defense, who was asserting that the
deputies committed misconduct and that the Mitchells were the victims, not
Adams.  The fact that Mrs. Mitchell had
lodged official complaints corroborated the Mitchells’ statements that they
believed that they had been mistreated by the deputies and had complained about
the mistreatment from the night of the confrontation forward, was not
prejudicial to Mr. Mitchell; indeed it was a component of his trial
defense.  The deputies were questioned in
some detail about reprimands recommended or received by them resulting from the
investigation into Mrs. Mitchell’s complaints (for failing to use recorders at
the scene in violation of departmental policy and ethics manual). Mr. Mitchell used
this evidence at trial, ultimately suggesting to the jury in closing argument
that the deputies’ testimony was not credible because officers had either
purposefully failed to turn on any audio or video recorders, or had turned them
on but claimed they had not because the recordings would have been harmful to
the deputies.  Finally, while Mitchell does not specify the limiting instruction that he
asserts should have been requested at trial, he presumably refers to the
traditional “404(b)” limiting instruction that the jury must believe that the
extraneous conduct occurred beyond a reasonable doubt before using it against
Mitchell.  However, as none of the
statements or questions complained of was limited by Rule 404(b), no such
instruction was warranted.[12]


          This record does not
support Mitchell’s contentions that his counsel’s failure to object to these
statements, questions, or request instructions was conduct that fell below
an objective standard of reasonableness, based on prevailing professional
norms.

          3.       Deprivation
of counsel at critical stage of proceedings

          Mitchell also argues that he was
deprived of counsel during the critical period of time in which a motion for
new trial could have been filed and argues that his appeal should be abated and
the case remanded to the trial court to restart appellate timetables.  See
Ward v. State, 740 S.W.2d 794, 800 (Tex Crim. App. 1987) (en banc) (holding
that when defendant is deprived of effective counsel during period for filing
motion for new trial, remedy is to abate appeal and reset appellate
guidelines).

          Mitchell acknowledges that a
presumption exists that he was represented by counsel during that time period
and that counsel acted effectively[13],
but argues that he has overcome the presumption by the fact that no motion for
new trial was filed and based on counsel’s affidavit[14]
attached to post-trial motions filed with this Court to abate and extend
appellate timetables pursuant to Texas Rule of Appellate Procedure 2(b).  Mitchell alleges that, although his retained
trial counsel did not actually withdraw from his representation in the trial
court, he was effectively abandoned by his trial counsel, causing him to be
deprived of effective counsel during the period in which a motion for new trial
could have been filed.  Mitchell does not
assert any specific claims that he would have raised in a motion for new trial,
but suggests that a motion for new trial would have aided him in developing a
record which would allow him to raise additional contentions on appeal.

           We note first that we may not abate this
appeal pursuant to Rule 2(b). Oldham,
977 S.W.2d at 359–60 (prohibiting use of Rule 2(b) to abate appeal and allow
out-of-time motion for new trial).  We
further observe, that, like the appellant in Oldham, Mitchell has failed to direct us to any specific grounds
that he alleges that he could not raise on appeal because he did not first file
a motion for new trial, though he notes, in general, that motions for new trial
“have been used primarily” for claims of newly discovered evidence or jury
misconduct and are “helpful for developing evidence” of ineffective assistance
of counsel. 

          The record indicates that Mitchell’s
retained trial counsel filed two notices of appeal, the second, filed during
the 30-day time period in which a motion for new trial could have been filed,
recites trial counsel’s assurance to the trial court that “he will continue to
represent the defendant on appeal.” 
There was no request for the appointment of counsel on appeal.  Under Oldham,
neither the appellate record nor the post-trial affidavits before us fails to
overcome the presumption that Mitchell was effectively represented by counsel
during that period.[15]  See id.
at 363;  See also Green v. State, 264 S.W.3d 63, 71
(Tex. App.—Houston [1st Dist.] 2007, pet. ref’d); Benson v. State, 224 S.W.3d 485, 497–98 (Tex. App.—Houston [1st
Dist.] 2007, no pet.).

          Furthermore, even if Mitchell was
deprived of counsel in this critical period, he has failed to establish harm by
presenting “facially plausible claims” to the appellate court that could have
been presented in the motion for new trial. 
See Cooks v. State, 240 S.W.3d
906, 911–12 (Tex. Crim. App. 2007). 
Conclusory allegations as to trial counsel’s ineffectiveness in general
ways (such as failing to call a material witness or failing to conduct a proper
investigation) are insufficient to establish the necessary evidence or
information that counsel would have presented at the motion for new trial that
reasonably could have changed the results of the case.  Id.  Here, Mitchell has not, in either his brief
or his Motion to Abate,[16]
urged any specific claim or evidence that he would have presented at a motion
for new trial, or how such evidence would have caused the outcome of the case
to be different (i.e., resulted in an acquittal or lesser sentence) or would
have permitted him to raise, and us to consider, specific issues which could
not otherwise be raised or considered on appeal.  Accordingly, appellant failed to meet his
burden to establish harm.  See id.; Thomas v. State, 286 S.W.3d 109, 115 (Tex. App.—Houston [14th
Dist.] 2009, no pet.) (holding that defendant must show harm from gap in
representation in critical phase and where appellant offers no explanation of
how harmed, for example, by showing what arguments he would have made on appeal
that he was prohibited from making as a result of failure to file motion for
new trial, any error in deprivation of counsel was harmless); Mashburn v. State, 272 S.W.3d 1, 5 (Tex.
App.—Fort Worth 2008, pet. ref’d) (holding that, when appellant did not say
what issues he would have raised on appeal that were not preserved by motion
for new trial, and no issues in brief were barred from consideration by failure
to be properly raised in motion for new trial, appellant was not entitled to
abatement of case for purpose of filing motion for new trial).  

          We overrule appellant’s issues one
through six.

Conclusion

 

          We affirm the judgment of the trial
court.  All pending motions are denied as
moot.

 

 

                                                          Jim
Sharp

                                                          Justice

 

Panel
consists of Justices Jennings, Higley, and Sharp.

Justice
Jennings, concurring in judgment only.

Do not publish. 
Tex. R. App. P. 47.2(b).











[1]          Tex. Penal Code Ann.
§ 22. 01(a)(1), (b)(1) (Vernon Supp. 2010).  

 





[2]           See Tex. Penal Code Ann. § 12.42(a)(3)(Vernon Supp. 2010) (providing for
second-degree felony punishment for a third-degree felony offense when it is
shown at trial that defendant had been previously convicted of a felony).

 





[3]
              All names are spelled as they appear in the court
reporter’s record.





[4]               At trial, Guedry also testified that the
confrontation had occurred around 10:30 at night, after the fire was
extinguished.  

 





[5]               At trial, Lawrence and Adams’ testimony conflicted
as to whether Mitchell had not been in or outside the safety perimeter.





[6]
              to achieve a “safety distance”





[7]
              Mitchell claimed to have been burned by the fire.

 





[8]               Mitchell’s booking photograph, which exhibited no
injuries, was admitted into evidence at trial.

 





[9]
              Photographs of Adams, taken about an hour and a half
after Mitchell was taken     into custody,
were admitted at trial.





[10]             Mitchell makes his contentions regarding ineffective
assistance of counsel under a listed “point of error one-six,” but does not
list his specific arguments discretely nor refer to them by a specific issue or
point number.  Accordingly, it is not
clear from Mitchell’s brief which argument is meant to be point of error one,
two, three, four, five, or six, respectively. 
We have been able to identify four discrete arguments and so we address
those arguments. 





[11]
            Mitchell
also denied resisting arrest.





[12]             We further note that Mrs. Mitchell admitted to “yelling and
cussing”, thus negating any dispute as to its occurrence.





[13]        See Oldham v. State, 977 S.W.2d 354, 363 (Tex. Crim. App. 1998) (holding that rebuttable
presumption exists that, when trial counsel does not withdraw and is not
replaced by new counsel after sentencing, defendant continues to be represented
by trial counsel during the period within which motion for new trial could have
been filed and that counsel acted effectively).

 





[14]             In
the affidavit, trial counsel stated that he advised Mitchell that he would file
a notice of appeal for him and Mitchell could hire an appellate lawyer to file
a motion for new trial who would have up to 30 days to do so.  Mitchell also attached other affidavits by
family members in a similar vein to motions in this Court.    





[15]             Mitchell’s
trial counsel’s affidavit specifically suggests that he gave erroneous advice
to Mitchell that he could still file a motion for new trial and that, by filing
Mitchell’s notice of appeal, he somehow deprived Mitchell of the opportunity to
file a motion for new trial.  However,
trial counsel advised Mitchell correctly, and counsel’s filing of the notice of
appeal did not deprive Mitchell of his right to file a motion for new trial
within 30 days as trial counsel had advised Mitchell that he could do.  See
McIntire v. State, 698 S.W.2d 652, 657 (Tex. Crim. App. 1985) (holding that
notice of appeal filed prior to filing of timely motion for new trial does not
deprive trial court of jurisdiction to rule on timely filed motion for new
trial).   





[16]             In his brief, as noted,
appellant mentions no specific evidence that he would have presented at a
motion for new trial.  In his motion to
abate, appellant likewise does not specify the evidence that he would have put
on the record in a motion for new trial nor explained how that would have
changed the outcome of the case.